**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 13 2001**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

ALFRED BRIAN MITCHELL,

      Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 99-6364

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 97-CV-283-T)

Randy A. Bauman, Assistant Federal Public Defender, Death Penalty Federal
Habeas Corpus Division, Oklahoma City, Oklahoma, for Petitioner/Appellant.

William L. Humes, Assistant Attorney General, Oklahoma City, Oklahoma (W. A.
Drew Edmondson, Attorney General of Oklahoma, Oklahoma City, Oklahoma,
with him on the brief), for Respondent/Appellee.

Before **SEYMOUR**, **LUCERO** and **MURPHY**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Alfred Brian Mitchell, a state prisoner sentenced to death, appeals the disposition of his petition for habeas corpus relief under 28 U.S.C. § 2254. For the reasons set out below, we affirm the district court's ruling that Mr. Mitchell's conviction was not constitutionally infirm, but we reverse the district court's decision upholding the imposition of the death penalty and grant Mr. Mitchell's petition for habeas relief on his claim that the sentence violated his right to due process.

# I

## Background

The facts underlying Mr. Mitchell's conviction and sentence are set out in the opinion disposing of his direct criminal appeal, *see Mitchell v. Oklahoma*, 884 P.2d 1186, 1191-92 (Okla. Crim. App. 1994), and will be recited in this opinion in detail when necessary to our consideration of the individual issues before us. To begin, we relate only an overview of the trial evidence.

Mr. Mitchell was adjudicated a juvenile offender for the rape of a twelve-year-old neighborhood girl and was incarcerated in a juvenile correctional facility for approximately three years prior to the events at issue here. He was released on December 23, 1990, when he reached his eighteenth birthday, and he returned to his family residence.

The victim in this case, Elaine Scott, was a college student who worked and volunteered at the Pilot Recreation Community Center. The Center served disadvantaged youth and was located near Mr. Mitchell's home in Oklahoma City. On January 7, 1991, the day of the crime, Ms. Scott was working at the Center with its director, Carolyn Ross. Ms. Ross took her lunch break at about 1:35 p.m. and left Ms. Scott alone in the Center. As Ms. Ross was leaving, she met Mr. Mitchell by the Center's door and spoke with him briefly. She testified that Mr. Mitchell was wearing a rust or reddish colored stocking cap. When Ms. Ross returned to the Center at 2:50 that afternoon, she noticed that Ms. Scott's car was gone and that the Center was not locked properly. After entering the Center, Ms. Ross discovered Ms. Scott's nearly nude body on the floor of the inner office, lying face down in a pool of blood. The victim had received a fatal injury to the back of the head caused by four or five blows with a wooden coat rack. In addition she had sustained blows from a metal golf club, puncture wounds from a drawing compass, and several blows to her face from a fist.

Allen Biggs, a roofer employed to fix a leaking roof in the Center's gym, went by the Center at about 1:40 to 1:45 to check on his work crew. He saw the victim's car in the parking lot with the engine running, but did not notice anyone in the car. As Mr. Biggs walked up to the door of the Center, Mr. Mitchell was standing in the doorway. He told Mr. Biggs that the Center was closed because

the bathrooms were being cleaned, and that a crew had come by and put a trash can under the leak. Mr. Biggs had the impression that Mr. Mitchell did not want him to enter the building, and he did not do so. A member of the roofing crew dispatched by Mr. Biggs stated that when the crew arrived at the Center at about 2:20, there were no cars in the parking lot and the building was empty. The crew took cans into the gym to place under the leaks, passing by the closed door to the office. They spent about forty minutes cleaning up the gym floor.

A witness who lived across from the Center saw Ms. Scott's car leave the parking lot between 1 and 2 p.m. the day of the crime. When first interviewed, the witness stated that she saw a black man wearing a red stocking cap alone in the car, although at trial she testified that the hat was green. Andre Wilson, an acquaintance of Mr. Mitchell who lived in the neighborhood, saw Mr. Mitchell the afternoon of the crime about a half-block away from the victim's car, which had been parked with two wheels up on the curb. Mr. Mitchell, who was walking away from the car, said he was wet and cold and did not want to talk. Another neighborhood resident, William Tuimalu, also saw Mr. Mitchell late that afternoon. Mr. Mitchell said that he had been at the Center earlier but left because a couple of guys were giving the girl working there a hard time. Mr. Tuimalu told the police to talk to Mr. Mitchell.

The police went to Mr. Mitchell's home and he agreed to help them find the two men he stated were at the Center with the victim when he left. The police at that point considered him a witness. They took him back to the Center to show the crime scene officers where the men might have left fingerprints and then drove him to several homeless shelters looking for the men. When this search was unsuccessful, the police took Mr. Mitchell home. He agreed to go to the police station the next morning to give a statement and help with identification drawings. He also gave the police the tennis shoes he had been wearing that afternoon.

The next morning, Mr. Mitchell called the police to arrange for transportation to the station, where he was interviewed for several hours and agreed to give body samples. Most of the interview was videotaped and presented to the jury. The officers conducting the interview were given updates on the criminal investigation as it proceeded, and they began to consider Mr. Mitchell a suspect when they learned that the tennis shoes he had given them the night before had tested positive for blood and that the distinctive pattern on the soles of the shoes appeared to match a footprint left in the victim's blood. Over the course of the interviews, Mr. Mitchell responded to this and other new information by reciting several versions of the events culminating in Ms. Scott's death. Although in some versions Mr. Mitchell admitted participating in the

crime in some manner, all of the versions involved at least one other actor who was more culpable than Mr. Mitchell. At trial, Mr. Mitchell gave yet another account of events in which he took no part in the crime but was merely present when a gang member named C. Ray assaulted Ms. Scott, killed her, and took her car and her purse.

Mr. Mitchell was charged with premeditated murder, first degree rape, and forcible anal sodomy in the death of Ms. Scott.[1] The state sought the death penalty in connection with the murder charge on the basis of three aggravating circumstances, alleging that the murder was especially heinous, atrocious or cruel; that it was committed for the purpose of avoiding arrest; and that Mr. Mitchell would commit future acts of violence, thereby constituting a continuing threat to society. The jury convicted Mr. Mitchell on all charges, found that the state had established all three aggravating circumstances, and sentenced Mr. Mitchell to death. After his convictions and sentence were affirmed on direct appeal, *see Mitchell*, 884 P.2d 1186, and his petition for state post-conviction relief was denied, *see Mitchell v. Oklahoma*, 934 P.2d 346 (Okla. Crim. App. 1997), Mr. Mitchell sought federal habeas corpus relief.

---

[1] Mr. Mitchell was also charged with and convicted of robbery with a dangerous weapon and larceny of an automobile in connection with Ms. Scott's death. Those convictions are not at issue in this appeal.

Following discovery and an evidentiary hearing, the federal district court granted relief on the convictions for rape and forcible anal sodomy. The state had presented evidence at trial through the testimony of Joyce Gilchrist, a forensic chemist with the Oklahoma City Police Department, that Mr. Mitchell's sperm had been found on the victim through anal and vaginal swabs. In fact, as discussed more fully below, DNA testing performed prior to trial by the FBI at Ms. Gilchrist's request established that no sperm was present on the anal and vaginal swabs and that sperm found on the victim's panties matched the DNA of her boyfriend, Phillip Taylor. In light of this evidence, the district court held that the rape and sodomy convictions were based on testimony that was misleading, if not false, and obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Although the court struck down these convictions as constitutionally infirm, it declined to invalidate the death penalty, stating that sufficient evidence remained to support the three aggravating circumstances found by the jury to justify that sentence.[2]

On appeal, Mr. Mitchell seeks habeas relief on six grounds, contending that (1) his competency determination was made under an unconstitutional standard and is therefore invalid; (2) he was denied a lesser included offense instruction in

---

[2] The state does not appeal the district court's decision granting relief on the rape and sodomy convictions. The state argues only that vacation of those convictions does not require setting aside the death penalty.

violation of *Beck v. Alabama*, 447 U.S. 625 (1980);[3] (3) evidentiary rulings at trial denied him the right to a fair trial and to present his defense; (4) statements made during his police interrogation were erroneously admitted against him at trial; (5) the admission of victim impact statements violated the Ex Post Facto Clause; and (6) the invalid rape and sodomy convictions require vacation of the death sentence.

## II

## Standards of Review

Mr. Mitchell filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and his case is therefore governed by its provisions. *See Williams v. Taylor*, 529 U.S. 420, 429 (2000).

> When reviewing the denial of a habeas corpus petition, we are generally subject to two different frameworks of review, depending upon whether the state courts addressed the merits of the claim for relief. If the state courts have not heard the claim on its merits, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. If the state courts have addressed the

---

[3] Mr. Mitchell did not assert his *Beck* claim in his appellate brief in chief. Before filing his appellate briefs, however, he sought a certificate of appealability from this court on that claim and the request was referred to this panel. His motion for a certificate of appealability presented an argument on the matter and the state filed a response. We grant a certificate of appealability on this issue.

> claim on its merits, we review the state court ruling under the
> standard enunciated under 28 U.S.C. § 2254.

*Hale v. Gibson*, 227 F.3d 1298, 1309 (10th Cir. 2000) (quoting *Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir. 1999)). After AEDPA, a federal court may not grant habeas relief on a claim adjudicated on the merits in state court unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). State court fact findings are presumed correct unless the petitioner rebuts them by clear and convincing evidence. *Hale*, 227 F.3d at 1309; *see also* 28 U.S.C. § 2254(e)(1).

A state court decision is contrary to clearly established federal law under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision is an unreasonable application of federal law under section 2254(d)(2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at at 413. The reasonableness of the state

court's application of federal law is to be evaluated by an objective standard. *See id.* at 409-10. The Supreme Court has cautioned "that an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412 (emphasis in original).

With the above factual and legal framework in mind, we turn to Mr. Mitchell's arguments on appeal. Some of Mr. Mitchell's claims are directed to the constitutionality of his conviction, some to the constitutionality of his death sentence, and some to both. Because the challenges to Mr. Mitchell's conviction, if successful, would obviate the need to address the death penalty issues, we consider those arguments first.

## III

### Competency

Mr. Mitchell claims he is entitled to habeas relief because his competency to stand trial was determined under an unconstitutional standard and because he was being medicated with a powerful antipsychotic drug when the determination was made. He asserts that his competency determination was thereby rendered wholly unreliable and that he is entitled to a new trial because a retrospective determination is not feasible.

Four months after Mr. Mitchell was arrested, the state trial judge ordered his competency evaluated. The court determined that a doubt as to Mr. Mitchell's competency existed, based on the court's personal observation of Mr. Mitchell as well as testimony regarding his ability to understand the proceedings against him and to assist his attorney in preparing for trial. Mr. Mitchell was evaluated and determined to be competent. After receiving the evaluation report, the court held a post-examination competency hearing at which Mr. Mitchell's attorney presented no evidence on the matter and stated his agreement with the report's conclusion that Mr. Mitchell was competent to stand trial. The court also addressed Mr. Mitchell, who stated that he agreed with his counsel's comments. The court then reviewed the competency report on the record and ordered the proceedings to resume, finding there was no doubt as to Mr. Mitchell's competency.

At the time of these proceedings, Oklahoma law required a defendant to establish lack of competency by clear and convincing evidence. *See Walker v. Atty. Gen.*, 167 F.3d 1339, 1342-43 (10th Cir. 1999); *see also* OKLA. STAT. tit. 22, § 1175.4(B) (1981). In 1996, the Supreme Court decided *Cooper v. Oklahoma*, 517 U.S. 348 (1996), striking down Oklahoma's "clear and convincing evidence" standard as incompatible with the dictates of due process. Mr. Mitchell thereafter brought a petition for state post-conviction relief, alleging that the trial court's

evaluation of his competency under the "clear and convincing" standard was unconstitutional. The state appellate court declined to apply the *Cooper* decision retroactively on post-conviction review and denied relief. *See Mitchell*, 934 P.2d at 349. In support of its ruling, the court cited its decision in *Walker v. State*, 933 P.2d 327, 338-39 (Okla. Crim. App. 1997), which held that a *Cooper* claim was barred by a petitioner's failure to challenge the "clear and convincing" evidence standard in a direct appeal made before *Cooper* was decided. In holding the claim barred, the state court in *Walker* had applied the 1995 amendments to Oklahoma's post-conviction procedures, under which a petitioner who has not raised the issue on direct appeal must show that the legal basis for the claim was unavailable at that time. *Id.* at 339.

Mr. Mitchell raised the *Cooper* issue again on federal habeas and the state argued the claim was procedurally barred. The district court was not persuaded that the state appellate court had applied a procedural bar to the claim and held, alternatively, that even if it had done so the bar would not be valid under our holding in *Walker v. Atty. Gen.*, 167 F.3d at 1345. Considering the merits, the court held that Mr. Mitchell had failed to present evidence raising a bona fide doubt about his competency at the time of trial and denied relief.

We are persuaded the state court did, in fact, hold Mr. Mitchell's claim procedurally barred by his failure to raise the issue on direct appeal.

-12-

Nevertheless, we agree with the district court that the state court's reliance on the procedural bar rule set out in the 1995 amendments to its post-conviction proceedings is not supportable under our reasoning in *Walker*.

As we held in *Walker*,

[t]he Supreme Court of the United States has made it clear that a state's procedural rule used to bar consideration of a claim must have been firmly established and regularly followed by the time as of which it is to be applied. We agree with the Ninth Circuit that the proper time for determining whether a procedural rule was firmly established and regularly followed is the time of [the] purported procedural default. A defendant cannot be expected to comply with a procedural rule that does not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed.

*Walker v. Atty. Gen.*, 167 F.3d at 1344-45 (citations and internal quotations omitted). Here, as in *Walker*, the state court invoked the 1995 amendments to its procedural default rules to bar Mr. Mitchell's *Cooper* claim because he had failed to raise that claim on direct appeal. However, that appeal was brought before 1995. As we pointed out in *Walker*, prior to the 1995 amendments it was settled law in Oklahoma that an intervening change in the law such as that created by *Cooper* constituted sufficient reason for a petitioner's failure to raise an issue on direct appeal. *See id.* at 1345. [4] Consequently, Mr. Mitchell is not procedurally

_____

[4] Indeed, as we pointed out in *Walker*, the Oklahoma Court of Criminal Appeals had specifically noted that a *Cooper* claim would have constituted an intervening change under Oklahoma law prior to the 1995 amendments. *See*

(continued...)

-13-

barred from seeking habeas relief on his *Cooper* claim and we turn to the merits of that claim.

"[C]ompetency claims can raise issues of both substantive and procedural due process." *Id.* at 1343. The district court characterized Mr. Mitchell's claim as procedural and he does not argue to the contrary on appeal. "To prevail on [a] procedural claim, a petitioner must establish that the state trial judge ignored facts raising a bona fide doubt regarding the petitioner's competency to stand trial." *Id.* (citations and internal quotations omitted). *See also McGregor v. Gibson*, 248 F.3d 946, 954 (10th Cir. 2001) (en banc). The district court reviewed all the evidence bearing on Mr. Mitchell's competency at trial, and found nothing in the record to create a bona fide doubt.

When, as here, the state court has not addressed the merits of a claim, we review the district court's legal conclusions de novo and its factual findings for clear error. *Hale*, 227 F.3d at 1309. "'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to

---

[4](...continued)
*Walker v. Att'y Gen.*, 167 F.3d 1339, 1345 (10th Cir. 1999) (citing *Valdez v. State*, 933 P.2d 931, 933 n.7 (Okla. Crim. App. 1997)). In this appeal, the state points to a recent unpublished opinion by the Oklahoma Court of Criminal Appeals holding that *Cooper* did not constitute an intervening change in the law. We reject the state's attempt to rewrite history. Prior to the 1995 amendments, Oklahoma law as set out in numerous decisions clearly would have recognized that the *Cooper* decision was a sufficient change in the law to excuse a petitioner's failure to raise the matter on direct appeal.

stand trial are all relevant' to the bona fide doubt inquiry." *Walker v. Atty. Gen.*, 167 F.3d at 1346 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). We have carefully reviewed the competency evidence and, like the district court, see nothing that raises a bona fide doubt as to Mr. Mitchell's competency at trial. As the district court pointed out, Mr. Mitchell testified extensively during the state court proceedings, and nothing in the record indicates that his behavior was irrational, that he did not understand the proceedings against him, or that he was unable to assist in his defense. Indeed, his counsel agreed with the evaluation report finding Mr. Mitchell competent and presented no contrary evidence either at the post-evaluation competency hearing or at trial. While newly discovered evidence shows that Mr. Mitchell was medicated with an antipsychotic drug during an eleven-month period that ended seven months before trial, Mr. Mitchell has presented no evidence to show that his previous medication rendered him incompetent at trial.

On appeal, Mr. Mitchell argues that a bona fide doubt exists because the state trial court made a pre-trial finding that a sufficient doubt was present at that time to require a competency evaluation. As an initial matter, we question whether a doubt sufficient to trigger a competency evaluation by mental health experts is or should be as high as the "bona fide doubt" standard we apply on

collateral review. [5] In any event, a doubt sufficient to require an expert evaluation may be overcome by the results of the evaluation itself, especially when considered together with other indications of competency.

Mr. Mitchell's argument confuses the weight to be given the competency evaluation by mental health experts and the weight to be given the judicial competency determination made after a competency hearing. We recognize that a judicial competency determination under the unconstitutional "clear and convincing" standard, even when based on an evaluation by mental health experts and other proper factors, is arguably analogous to the situation in which no hearing has taken place and therefore is entitled to no weight in the bona fide doubt inquiry. *See id.* at 1345 (competency determination under improper standard "not entitled to a presumption of correctness"). The expert evaluation itself, however, is a proper factor for this court to consider. *See id* . at 1346 (quoting *Drope* , 420 U.S. at 180). Moreover, as the district court pointed out, in this case use of the incorrect burden of proof was irrelevant because Mr. Mitchell presented no evidence at his competency hearing for evaluation under that standard and conceded he was in fact competent. We hold that Mr. Mitchell has

---

[5] We held in *McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) (en banc) that "the mere fact that the trial court granted a competency hearing will not suffice to demonstrate a bona fide doubt." *Id.* at 954. That holding would seem to apply also to the court's finding that a competency evaluation was appropriate.

failed to raise a bona fide doubt as to his competency at the time of his trial and is therefore not entitled to relief on that claim.

## IV

## Lesser Included Offenses

Mr. Mitchell sought instructions on two lesser included offenses, first degree manslaughter and second degree murder. He argued that he was entitled to these instructions under *Beck v. Alabama*, 447 U.S. 625 (1980), because his trial testimony and/or his taped interview could support a finding that he did not intend to kill the victim. The trial judge refused to give the instructions, stating that the record contained no evidence to support them. Mr. Mitchell raised this issue in his direct appeal, and the state appellate court rejected it. In so doing, the court focused only on Mr. Mitchell's trial testimony that he looked on as C. Ray killed the victim, holding on the basis of prior case law that

> where a defendant claims he is innocent and another committed the crime, the defendant is not entitled to instructions on lesser included offenses. When a defendant's testimony excludes all but one theory of defense, he is deemed to have elected that theory. Mitchell testified that he had nothing to do with any violence directed at Scott, but watched as C. Ray beat and killed her. Mitchell cannot use the "aider and abetter" theory to benefit from lesser included instructions that would apply to actions he says he did not commit.

*Mitchell*, 884 P.2d at 1200 (footnotes omitted).

The federal district court also denied relief on this claim. The court acknowledged that Mr. Mitchell had admitted during his taped interrogation to striking the victim, but deferred to the state court's holding that Mr. Mitchell could not rely on that evidence because he was bound by his contrary trial testimony. In addition, the court held that the instructions were not constitutionally mandated in any event because, unlike the circumstances at issue in *Beck*, the jury here was not required to impose a sentence of death upon convicting Mr. Mitchell of first degree murder but instead had the option of sentencing him to life imprisonment with or without the possibility of parole.

We turn first to the district court's alternative ruling that the lesser included offense instructions requested here were not required under *Beck* even if the record contained evidence to support them. The state procedure at issue in *Beck* "forbade the state trial judge in a capital case 'from giving the jury the option of convicting the defendant of a lesser included offense,' and . . . required the jury to 'fix the punishment at death' if it found the defendant guilty." *Hooks v. Ward*, 184 F.3d 1206, 1223 (10th Cir. 1999) (quoting *Beck*, 447 U.S. at 628 & n.3). The Court held that "the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction," and that the state was therefore "constitutionally prohibited from withdrawing that option from the jury in a capital case." *Beck*, 447 U.S. at 638, 643. "The goal of the Beck rule . . . is to

-18-

eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984). After *Beck*, therefore, "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck*, 447 U.S. at 627.

In *Hooks*, this court addressed the applicability of the *Beck* rule to Oklahoma's two-stage death penalty scheme, under which the jury has the discretion to impose a sentence less than death after finding a defendant guilty of first degree murder. We held that the Supreme Court's emphasis on "the reliability of the *conviction* decision, as opposed to the *sentencing* consequences," rendered suspect "any assumption that discretion at the sentencing stage can make up for the lack of an option to convict of a lesser included offense supported by evidence at the guilt phase." *Hooks*, 184 F.3d at 1228-29 (emphasis in original). "[A] jury that gets to stage two based on an unreliable determination at stage one may not be able to convey accurately its doubt about guilt through its sentencing determination." *Id*. at 1229. We concluded that *Beck* applies even "where the convicting jury later had the discretion to sentence the defendant to life, instead of death." *Id.* 1226. The federal district court here was thus incorrect in holding

-19-

that lesser included offense instructions are not constitutionally required under Oklahoma's capital murder scheme even if supported by the evidence.

The state appellate court acknowledged that under *Beck* "[a] defendant in a capital case is entitled to instructions on any lesser included non-capital charge supported by the evidence." *Mitchell*, 884 P.2d at 1200 & n.42. Nonetheless the court held that under state law, a defendant who "claims he is innocent and another committed the crime . . . is not entitled to instructions on lesser included offenses. When a defendant's testimony excludes all but one theory of defense, he is deemed to have elected that theory." *Id.* at 1200 (footnote omitted).

In so ruling, the state court refused to take into account the videotaped interview that was presented to the jury and in which Mr. Mitchell admitted to various degrees of involvement in the crime. Fairly read, the state court opinion appears to hold that Mr. Mitchell was bound by his trial testimony asserting his complete innocence, and was precluded by state law from relying on the videotape evidence to request lesser included offense instructions even if his taped statements would have supported such instructions. The court's implicit holding that this application of state law passes muster under *Beck* is a legal conclusion that under AEDPA may not be set aside unless it is contrary to or involves an unreasonable application of clearly established federal law as determined by the

-20-

Supreme Court. *See* 28 U.S.C. § 2254(d)(1). We are persuaded that this standard, although demanding, is met here.

*Beck* makes clear that state rules barring properly supported lesser included offense instructions in a capital case are constitutionally impermissible because such rules "diminish the reliability of the guilt determination" and "enhance[] the risk of an unwarranted conviction." 447 U.S. at 638. The state law upon which the appellate court here relied precluded Mr. Mitchell from basing his request for lesser included offense instructions upon his videotaped statements without regard to whether those statements would have supported his conviction for lesser crimes. It thus forced the jury into the "all-or-nothing choice between capital murder and innocence" condemned in *Beck* and its progeny. *Hooks*, 184 F.3d at 1224. Consequently, the state court ruling does not bar the grant of habeas relief.

We turn to the inquiry mandated by *Beck* and assess whether the evidence at trial, viewed as a whole and including the statements made on the interview videotape, warranted the giving of the lesser included offense instructions Mr. Mitchell requested. In so doing, we must determine whether "the evidence presented at trial would permit a rational jury to find [Mr. Mitchell] guilty" of the

lesser offenses and "acquit him of first-degree murder." *Hogan v. Gibson*, 197 F.3d 1297, 1307 (10th Cir. 1999), *cert. denied*, 121 S. Ct. 1297 (2000). [6]

Mr. Mitchell requested instructions on second degree murder and first degree manslaughter. Oklahoma defines second degree murder as homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." OKLA. STAT. tit. 21, § 701.8. [7] First degree manslaughter is defined as homicide "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." *Id.* § 711. Both

[6] It might be possible to view the state appellate court ruling as a holding that the evidence did not warrant the giving of the lesser included offense instructions requested by Mr. Mitchell. Our cases have not been consistent as to whether this issue is a conclusion of law or a finding of fact. *See Hogan v. Gibson*, 197 F.3d 1297, 1306 & n.6 (10th Cir. 1999) (citing conflicting cases and stating correct approach is to treat sufficiency of evidence for lesser included offense instruction as matter of law). The state in this appeal views the matter as one of law for purposes of review under AEDPA, *see* Resp. Supp. Br. at 2, and to the extent necessary we do so as well.

[7] Subsequent to Mr Mitchell's trial, the Oklahoma Court of Criminal Appeals held that "second degree depraved mind murder is not a lesser included offense of first degree malice murder." *Willingham v. State*, 947 P.2d 1074, 1081-82 (Okla. Crim. App. 1997), *overruled on other grounds*, *Shrum v. State*, 991 P.2d 1032 (Okla. Crim. App. 1999). As we have pointed out, however, prior to that holding Oklahoma "courts treated second degree 'depraved mind' murder as a lesser included offense of first degree malice murder." *Boyd v. Ward*, 179 F.3d 904, 916 (10th Cir. 1999).

lesser included offenses at issue here thus require that the defendant have no intent to kill. We therefore examine the evidence presented at trial to determine whether it would allow a rational jury to find that Mr. Mitchell perpetrated the homicide without an intent to kill.

Mr. Mitchell's trial testimony obviously does not support the lesser included offense instructions because, as observed by the state appellate court, he denied any part in the crime and contended he was merely a passive bystander. Similarly, at various points in the videotaped interview, Mr. Mitchell stated that he simply stood by as two black men assaulted, robbed and killed the victim. While he did admit at one point in the interview to telling the two men that he would participate in the robbery, he also stated that he left the Center before the victim was assaulted. In other versions of the crime, he stated that he was there when the two men hit her numerous times with the coatrack but that he himself took no part in the crime and left while she was still alive for fear of his own life. All of this evidence to the effect that Mr. Mitchell took no part in the crime, if believed by the jury, would require a verdict of innocence rather than a conviction of homicide without an intent to kill.

Mr. Mitchell also gave a version of events during the interview in which he alone robbed the victim, met a friend while leaving the Center, and gave the friend the keys to the victim's car. He and the friend then went back into the

-23-

Center and the friend said that Mr. Mitchell would have to kill Ms. Scott. Mr. Mitchell admitted that he gave a golf club to his friend, who then hit the victim with it several times, and that as the victim tried to run away Mr. Mitchell grabbed her. When she got away from him and slammed his finger in the door, he hit her in the face with his fist. Mr. Mitchell said that things then got out of hand. His friend told the victim to take off her clothes, and when she then grabbed Mr. Mitchell from behind in a chokehold, Mr. Mitchell hit her three or four times with the wooden coatrack as his friend urged him to kill her. Mr. Mitchell stated that his friend then struck the victim and that the last time his friend hit her, she became quiet.

Nothing in this evidence would allow a rational jury to find that Mr. Mitchell participated in the crime without the intent to kill. Moreover, we have carefully reviewed the entire trial transcript and have uncovered no other evidence that would support such a finding. The circumstances of the killing set out by Mr. Mitchell in this account simply do not raise a reasonable doubt as to whether he acted with an intent to cause death. Consequently, Mr. Mitchell's trial was not rendered unconstitutional by the court's refusal to instruct on lesser included offenses.

## V

## Evidentiary Rulings

Mr. Mitchell argues that evidentiary rulings made during his trial allowing lay opinion testimony and refusing to allow expert opinion testimony denied his right to present a defense, to a fair trial, and to a reliable sentencing determination. Although we, like the district court, find this issue very troubling, we ultimately conclude that these evidentiary rulings do not warrant relief.

The state trial court allowed the prosecution to present testimony from Officer Maddox, one of the officers who conducted the videotaped interview of Mr. Mitchell, in which Officer Maddox gave to the jury his definition of the term "disassociation," a word he had used during Mr. Mitchell's interrogation. Officer Maddox testified that "[d]isassociation is when someone tells you about an incident they have been involved in but they are telling it like they are watching someone else participate in it." Trial Trans., vol. VII, at 1177. Under Officer Maddox's definition, Mr. Mitchell was not telling the truth when he offered versions of the crime in which he stood by as others assaulted and killed the victim. Mr. Mitchell objected to this testimony on the ground that the witness was "giving his interpretation of things that the jury has seen," *id.* at 1175, and the objection was overruled. When asked on cross examination to give his criteria for deciding when an interviewee is lying, Officer Maddox responded:

Well, when you are doing an interview you watch for body language. You watch for someone crossing arms or holding things in. You watch for openness. You watch for eye contact. You watch for someone that has to study about something or they're thinking about things rather than it flowing easily.

*Id.* at 1195.

Mr. Mitchell sought to counter this testimony by presenting evidence from Dr. Wanda Draper, a developmental psychologist, who had conducted extensive interviews with Mr. Mitchell and his family and had reviewed his records. Her testimony would have supported the notion that Mr. Mitchell was covering for the actual perpetrator, who was probably his brother, and that his inconsistent stories were part of that effort. In proffering this evidence, defense counsel explained that Dr. Draper's testimony would "give the jury some help with motivation for persisting in these lies." *Id.* at 1169. Defense counsel further stated that Dr. Draper would not offer an opinion as to whether Mr. Mitchell was lying, but would instead "say some of the things developmentally in Brian's makeup that makes him the kind of person who would tell lies like this." *Id.* at 1170. The court refused to admit the evidence, stating that defense counsel was asking the court to "allow the third person to get on the stand in the defense of the case and interpret what the defendant was doing when actually that is the jury's responsibility." *Id.* at 1169. When defense counsel pointed out that Officer Maddox's testimony was subject to the same objection, the court responded that

-26-

the officer was "not an expert psychiatrist and not retained for that function."      *Id.* at 1170.

Mr. Mitchell raised these evidentiary rulings in his direct criminal appeal. *See Mitchell* , 884 P.2d at 1197. In addressing the admission of Officer Maddox's testimony, that court characterized Mr. Mitchell's claim on appeal as arguing that the testimony was improper because it amounted to a lay person giving a medical diagnosis, while at trial he had objected on the ground that it improperly bolstered the taped statements.   *See id.* The court further stated that "[w]hen a defendant objects on a specific ground at trial, this Court will not entertain an objection on appeal which differs from the trial objection."      *Id.* While thus finding the issue procedurally barred, the court nonetheless, determined on the merits that Officer Maddox's "comments about disassociation and his testimony that he watched Mitchell's body language as one clue that he was lying" were not opinions offered "as expert aids to the jury," and that his testimony was therefore not error.      *Id.*

The state appellate court also upheld the trial court's refusal to admit Dr. Draper's testimony providing a possible motivation for the patently inconsistent stories Mr. Mitchell gave in his interrogation. The court rejected Mr. Mitchell's argument that the state had opened the door to this evidence through Officer Maddox's testimony, relying on its alternative disposition of the merits of the Maddox claim. The court held that Dr. Draper's testimony would have

-27-

improperly "interpret[ed] and explain[ed] Mitchell's actions and motives on the tapes, which is exactly what the jury was required to do in determining the weight and credibility to afford Mitchell's statements." *Id.*

Mr. Mitchell pursued his allegations of error on federal habeas, contending the state court rulings infringed on his right to present a defense and rendered his trial fundamentally unfair. The state did not respond on the merits, arguing instead that the Oklahoma appellate court had applied a procedural bar to the claim based on Officer Maddox's testimony. The district court disagreed, concluding that the state court had not applied a procedural bar to Officer Maddox's testimony because it had alternatively resolved the merits. The district court therefore addressed the merits as well.

We begin our consideration of this issue with the state's argument that habeas relief is precluded due to the state court's application of a procedural bar. As the state correctly points out, when, as here, a state court explicitly invokes a state procedural bar rule as a ground for decision and alternatively addresses the merits of a claim, consideration of the issue on federal habeas is curtailed. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). The instant case, however, presents the unusual situation in which the claim subject to procedural bar, here Officer Maddox's testimony, is interconnected with the claim that is not barred, Dr. Draper's testimony. As the state appellate decision makes clear, the merits of

the Dr. Draper claim cannot be decided without addressing the merits of the Officer Maddox claim. *See Mitchell*, 884 P.2d at 1197 (holding Mr. Mitchell's claim addressing Dr. Draper's testimony fails with merits of claim based on Officer Maddox's testimony, and subsequently ruling on merits of both claims in one sentence). Under these peculiar circumstances, we are uncertain whether the rule in *Harris* is applicable. *See Coleman v. Thompson*, 501 U.S. 722, 734-40 (1991) (discussing when state court decision fairly appears to be interwoven with federal law and when it expressly rests on state procedural grounds). We need not decide this thorny issue because even assuming the merits of both claims are properly before us they do not entitle Mr. Mitchell to habeas relief under the high standards of AEDPA, which we must apply.

The district court correctly observed that a federal habeas petitioner is not entitled to habeas relief on the basis of erroneous evidentiary rulings unless he can show that, "because of the court's actions, his trial, as a whole, was rendered fundamentally unfair." *Maes v. Thomas*, 46 F.3d 979, 987 (10th Cir. 1995) (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1557 (10th Cir. 1991)). Although the court stated that allowing Officer Maddox's testimony was "ill-advised," the court

also pointed out that this evidence was not "particularly conspicuous," and did not render the trial as a whole unfair. [8]

The court likewise determined that the exclusion of Dr. Draper's testimony to rebut that of Officer Maddox was not error of constitutional dimension. Although it characterized as "inexplicable" the state courts' decisions that Dr. Draper's testimony would infringe on the jury's responsibility while Officer Maddox's testimony did not, the court concluded that Dr. Draper's testimony was not material because it would not have created a reasonable doubt that did not otherwise exist.

On appeal, Mr. Mitchell contends the district court erred in applying the "fundamentally unfair" standard of review to these claims because the rulings at issue infringed on his specific constitutional right to present a defense. He argues that in these circumstances the law requires closer scrutiny, citing *Paxton v. Ward*, 199 F.3d 1197, 1215 (10th Cir. 1999). That case is distinguishable because the evidentiary ruling at issue there allowed the prosecutor to make "material misrepresentations designed to mislead the jury." *Id.* at 1216. In holding that

---

[8] The court voiced particular concern that the trial court's ruling allowed the state to connect Officer Maddox's definition of disassociation as lying with the statement "why did they kill her" made by Mr. Mitchell when he was alone in the interrogation room. We too find this circumstance troublesome, although we ultimately agree with the trial court that in light of the entire record, it did not bring about a fundamentally unfair trial.

habeas relief was available without a showing that the entire proceeding was rendered fundamentally unfair, *Paxton* relied on authority addressed to prosecutorial misconduct rather than to evidentiary rulings. *See id.* at 1217-18 & n.10. Here we are concerned only with allegedly erroneous evidentiary rulings. The discussion in *Paxton* on which Mr. Mitchell relies is therefore inapposite.

Mr. Mitchell claims that the trial court denied him his constitutional right to present witnesses in his own defense by allowing the testimony of Officer Maddox while excluding the testimony of Dr. Draper. To establish such a claim, Mr. Mitchell must show

> a denial of fundamental fairness: In order to declare a denial of [fundamental fairness] we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial. It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the trial's outcome. In other words, material evidence is that which is exculpatory–evidence that if admitted would create reasonable doubt that did not exist without the evidence.

*Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (citations and internal quotations omitted). We assess whether the evidentiary rulings violated Mr. Mitchell's right to present witness testimony under a two-part test: "we first examine whether that testimony was relevant, and if so, whether the state's interests in excluding the evidence outweighed [Mr. Mitchell's] interests in its admittance. . . . Second, we examine whether the excluded testimony was

-31-

material–whether it was of such an exculpatory nature that its exclusion affected the trial's outcome."  *Id.*

Mr. Mitchell sought to present Dr. Draper's evidence in order to counter the inferences the jury could reasonably draw from Officer Maddox's testimony, i.e., that Mr. Mitchell lied during his interrogation in stating that another person had committed the crime and that he did so because he himself was guilty.  Dr. Draper would have testified that although Mr. Mitchell did in fact recite inconsistent versions of the crime, he did so in order to cover for his brother, who was the actual perpetrator.  This evidence is at least marginally relevant because it tends to show that while Mr. Mitchell did lie by presenting inconsistent versions of events, he did not lie when he stated that another had actually committed the crime.

The state's interest in excluding this testimony may be addressed summarily.  The trial court refused to allow the testimony because the court believed it would usurp the fact-finding mission of the jury, and the state appellate court approved this justification on appeal.  Preserving the jury's role is clearly a legitimate state concern.  However, as the district court observed, "the state courts' decision in the present case that Dr. Draper's testimony 'would have infringed on the jury's responsibility' but Maddox's testimony did not is inexplicable."  Rec., vol. III, doc. 68 at 36.  Accordingly, we conclude that the

state's interest is served marginally if at all by excluding Dr. Draper's testimony while allowing that of Officer Maddox. In sum, while the interests in this case are fairly equally balanced, the weight tips in favor of Mr. Mitchell's interest in presenting relevant evidence.

After balancing the interests involved, "we must determine whether the defendant was denied a 'fundamentally fair' trial; therefore, looking at the record as a whole, we inquire as to whether the evidence was of such an exculpatory nature that its exclusion affected the trial's outcome." *Richmond*, 122 F.3d at 874. Dr. Draper's testimony would have suggested to the jury that Mr. Mitchell's multiple versions of the crime were intended to cover his brother's role in events. This evidence would have provided a basis for the state to argue either that Mr. Mitchell lied in all the versions of the crime the jury heard, or told the truth in one of his versions in which he admitted either merely being present when another assaulted and killed Ms. Scott or participating in the crime to a lesser degree than the other person present. Consequently, the evidence would not by necessity have exculpated Mr. Mitchell, particularly given the version he told in the videotaped interview in which he and another together beat the victim to death.

Moreover, the evidence against Mr. Mitchell, while circumstantial, was substantial. Witnesses placed him at the Center shortly before and during the period in which the crime was committed, as well as in close proximity to the

-33-

victim's subsequently abandoned car.  A footprint matching his shoe was found in the victim's blood and her blood type was found on his sweat pants.  No other footprints were found at the crime scene despite the large amount of blood on the floor near the body, and no other evidence at the crime scene indicated the presence of a second assailant.  In addition, the state presented evidence that Mr. Mitchell knew many of the details of the crime and the crime scene, including the fact that a coatrack was used as a weapon, without being told.  In our view, when evaluated in light of the entire record, Dr. Draper's testimony was not of such an exculpatory nature that its admission might have affected the outcome of the proceeding.  Its omission thus did not deprive Mr. Mitchell of his right to a fundamentally fair trial.


**VI**

**Admission of the Videotaped Interview**

Mr. Mitchell offers three interrelated arguments supporting his claim that some or all of his videotaped interrogation should not have been admitted at trial. First, he contends he made a request for counsel during the interview which was not honored by the police, and all statements he made after that request should have been suppressed.  Second, he asserts he was not a suspect at the beginning of his interview when he was given    *Miranda*  warnings, and he should have been told

of his rights again at the point in the interview when he became a suspect and was no longer free to leave. He argues the statements he gave after being told he was in custody should therefore have been suppressed. Finally Mr. Mitchell contends the statements he gave during the interview were not voluntary, but instead were the product of coercive interrogation techniques used on a youthful offender with no exposure to the adult criminal justice system. All of these arguments are directed primarily to the statements Mr. Mitchell made toward the end of his interrogation in which he described robbing the victim, meeting a friend as he was leaving the Center, and returning with the friend to murder the victim.

### A. Request for Counsel

Mr. Mitchell's contention that the failure to honor his request for counsel required suppression of his subsequent statements is based on his query late in the interrogation asking officers whether he needed an attorney. Mr. Mitchell raised this alleged denial of the right to counsel in his direct criminal appeal. The state appellate court, after reviewing Mr. Mitchell's previous experience with the criminal justice system and other evidence bearing on the issue, held that his statement was not a request for counsel. The federal district court concluded that this holding was not contrary to clearly established federal law as determined by

the Supreme Court, citing *Davis v. United States*, 512 U.S. 452 (1994), and denied relief. We agree.

If a suspect waives his right to counsel after receiving *Miranda* warnings, he may be questioned by the police. *Id.* at 458. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). A court determines whether the accused has actually invoked his right to counsel under an objective standard which "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). The Supreme Court has made clear that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the Court's] precedents do not require the cessation of questioning." *Id.*

Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under *Davis*. The officers knew that Mr. Mitchell had previous experience with the criminal justice system and had in fact gone through a juvenile adjudication. He had been given

-36-

*Miranda* warnings when the interrogation began and clearly knew that he had the right to counsel. Given these circumstances, Mr. Mitchell's query about the *need* for counsel is not an unambiguous request for the *assistance* of counsel. Accordingly, his subsequent statements were not subject to suppression on the ground that they were made in violation of his Sixth Amendment rights.

## B. Timeliness of Miranda Warnings

Mr. Mitchell next contends that, although he received and waived his *Miranda* rights at the commencement of his interview, admission of statements he made during that interview after being informed that he was in custody should have been suppressed because he was not given *Miranda* warnings again at that point. Mr. Mitchell first raised this issue in state post-conviction proceedings, and the state appellate court held the matter procedurally barred by his failure to raise it on direct appeal. *See Mitchell*, 934 P.2d at 348 n.9. The court did, however, review and summarily reject the merits of the claim in addressing Mr. Mitchell's argument that his counsel was ineffective in failing to raise it on direct appeal. On federal habeas, the district court likewise held this argument without merit, distinguishing the cases upon which Mr. Mitchell premised his argument and pointing out the lack of any case requiring a person in Mr. Mitchell's position to be given a second set of *Miranda* warnings.

-37-

We turn first to the issue of procedural bar. "[F]ederal habeas review of claims defaulted in state court pursuant to an independent and adequate state procedural rule is barred 'unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.'" *Sherrill v. Hargett*, 184 F.3d 1172, 1174 (10th Cir. 1999) (quoting *Coleman*, 501 U.S. at 750). "Attorney error amounting to constitutionally ineffective assistance of counsel constitutes 'cause' for a procedural default." *Hickman v. Spears*, 160 F.3d 1269, 1272 (10th Cir. 1998). To establish ineffectiveness, a petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that the deficiency was prejudicial to his defense. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Prejudice, in turn, requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. If the ineffective assistance claim itself has no merit, it "cannot constitute 'cause' for [a petitioner's] default in state court." *Sherrill*, 184 F.3d at 1176. If the issue Mr. Mitchell's appellate counsel failed to raise would not have prejudiced his defense, therefore, counsel was not ineffective and Mr. Mitchell's claim is not cognizable on federal habeas.

Mr. Mitchell argues that the *Miranda* warnings given here were ineffectual in view of the lengthy period between the time they were given and the point at

which he was actually told he was in custody. [9] He asserts that the officers who conducted the interview did not promptly place him in custody after identifying him as a likely suspect and that the delay in custodial interrogation minimized the effect of the previously given warnings. We are not convinced. Numerous courts have rejected the argument that the passage of time alone invalidates previously given *Miranda* warnings. "The mere passage of time . . . does not compromise a *Miranda* warning. Courts have consistently upheld the integrity of *Miranda* warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation." *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996) (quoting *United States v. Diaz*, 814 F.2d 454, 461 (7th Cir. 1987)); *see also United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (listing cases). In *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995), for example, the court determined that new warnings were not required when the defendant was interviewed the day after the warnings had been given.

---

[9] Mr. Mitchell again cites the cases determined to be inapposite by the district court. We agree with that court's assessment. All of those cases address the circumstances in which a person is considered to be in custody and therefore entitled to be given *Miranda* warnings. *See United States v. Flitcraft*, 863 F.2d 342, 344 (5th Cir. 1988); *United States v. Hocking*, 860 F.2d 769, 772-73 (7th Cir. 1988); United *States v. Feather*, 801 F.2d 157, 158 (4th Cir. 1986). Here it is undisputed that Mr. Mitchell had been given the warnings prior to his custodial interrogation; the issue is whether the lapse between the warnings and the custody vitiated the warnings' protection. Those cases simply do not inform this inquiry.

-39-

The Supreme Court has considered the issue in a related context.    *See Wyrick v. Fields*, 459 U.S. 42 (1982) (per curiam).  There, the defendant was given *Miranda* warnings before undergoing a polygraph test and agreed to take the test without counsel present.  At the conclusion of the test less than two hours later, he was told that the test indicated some deception.  He then made incriminating statements to an investigating agent.  At that point, the defendant was given *Miranda* warnings again and questioned by a different agent and a police chief, to whom he repeated his incriminating statements.  At trial the defendant sought to suppress the testimony of the two agents and the police chief regarding his statements, arguing that they were made in violation of his right to counsel.  The state courts denied suppression on the ground that the defendant had been advised of his rights and had waived them.  On federal habeas, the circuit court acknowledged that the defendant had waived his right to counsel during the test, but held that he had not done so with respect to his post-test interrogation because the defendant had not been given "   *'meaningfully timed Miranda warnings.'*"  *Id.* at 47 (quoting *Fields v. Wyrick*, 682 F.2d 154, 160 (8th Cir. 1981)).

The Supreme Court criticized the circuit court for failing to examine the "totality of the circumstances," and held that the defendant had "validly waived his right to have counsel present at 'post-test' questioning, unless the

-40-

circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). In making this assessment, the Court looked to whether the character of the interrogation had changed significantly, and whether the questions put to the defendant subsequently would have caused him to forget the rights of which he had been advised and which he had previously understood. *Id*. at 47-49.

The totality of the circumstances of Mr. Mitchell's interrogation clearly indicate that his statements were not rendered inadmissible by his failure to receive *Miranda* warnings after he was no longer free to leave. Although Mr. Mitchell had just turned eighteen, he was experienced in the juvenile criminal justice system, having gone through a delinquency adjudication and a three-year confinement. And even though Mr. Mitchell progressed from a witness to a suspect during the interview, the nature of the interrogation itself did not change: he was continuously questioned about the circumstances of the crime. Finally, it is significant that several hours after the interview began Mr. Mitchell asked the officers if he needed an attorney, indicating that he was aware then of his right to have counsel present. In sum, the totality of the circumstances does not show that Mr. Mitchell was unaware of his rights, or that he was naive about the process in which he was involved. Consequently, his rights were not violated by the

admission of the post-custodial statements he made during his interrogation, notwithstanding his failure to receive warnings again at that time.


### C. Coercion

Finally, Mr. Mitchell contends his interrogation statements were inadmissible because they were coerced rather than freely and voluntarily given. The state trial court held a pretrial hearing on the voluntariness of Mr. Mitchell's statements and subsequently ruled that Mr. Mitchell's *Miranda* warnings were proper and his statements were voluntary. Defense counsel pointed out that following an untaped gap in the interrogation during which Mr. Mitchell provided body samples, his demeanor changed and he gave his most incriminating version of the crime. Counsel contended Mr. Mitchell's changed demeanor and new story supported his testimony that he had been intimidated during the period the videotape was not running and that his subsequent statements were therefore involuntary. The trial court disagreed, stating that although Mr. Mitchell's demeanor had changed somewhat, it had also changed several times throughout the first part of the interview. The court also noted Mr. Mitchell's testimony at the pretrial hearing that he understood the *Miranda* warnings when they were given. The state appellate court affirmed, reciting evidence on the interview videotape showing that the police had not coerced or intimidated Mr. Mitchell

while the tape was running.  On habeas, the district court reviewed the state appellate court's recitation of these facts and held that Mr. Mitchell had not rebutted them by clear and convincing evidence or shown the state court decision to be contrary to clearly established federal law.

We turn first to our standard of review of this issue under AEDPA. Although the ultimate question of whether the statements were voluntary is a mixed question of law and fact subject to review under the standards of section 2254(d)(1), any subsidiary factual findings made by the state trial court at the conclusion of the pretrial hearing are entitled to a presumption of correctness under section 2254(e)(1) that must be overcome by clear and convincing evidence.  *See Trice v. Ward*, 196 F.3d 1151, 1169-70 (10th Cir. 1999).

The state trial court held after the suppression hearing that Mr. Mitchell understood the warnings he was given, and that he had not been subjected to intimidating police conduct during the unrecorded gap in the interview.  *See* Trial Trans., vol. I at 4-6.  In so doing, the court weighed the credibility of Mr. Mitchell against that of the police officers present during the unrecorded period. These findings are entitled to a presumption of correctness and Mr. Mitchell has not produced clear and convincing evidence to rebut them.  Thus, in addressing whether Mr. Mitchell's statements were voluntary as a matter of law, we presume

that Mr. Mitchell understood the warnings he was given and that he was not subjected to coercion during the unrecorded moments at the police station.

> Whether a confession was voluntary depends upon the "totality of the circumstances," including "the crucial element of police coercion," "the length of the interrogation" and "its continuity," "the defendant's maturity," "education," "physical condition," and "mental health," and "the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation."

*Trice*, 196 F.3d at 1170 (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)).

The taped interrogation itself reveals no action by the interviewing officers that would support a finding of coercion sufficient to overcome Mr. Mitchell's understanding of his *Miranda* rights. Mr. Mitchell testified at the suppression hearing that he had his GED certificate, that he had dealt with the police in his prior juvenile arrests, and that he had been interviewed and given *Miranda* warnings by a police officer in connection with his previous juvenile rape adjudication. We see nothing in the totality of the circumstances to show that any factor undermined the voluntariness of his statements. The state courts' conclusion that Mr. Mitchell's statements were freely given is not an unreasonable application of controlling Supreme Court precedent.

# VII

## Impact of the Vacated Convictions on the Death Penalty

Based on newly discovered exculpatory evidence, Mr. Mitchell argued to the district court that his convictions for rape and sodomy were constitutionally infirm on several grounds, asserting that the state failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), that testimony by the state's forensic chemist was false and misleading, and that the prosecution engaged in egregious misconduct by capitalizing on this testimony to mislead the jury. The state did not respond to those allegations. Following an evidentiary hearing,[10] the district court struck down the rape and sodomy convictions in a scathing decision describing the state's "blatant withholding of unquestionably exculpatory evidence [as] absolutely indefensible," the forensic chemist's testimony as "without question, untrue," and the state's closing argument as "absolutely untenable." Rec., vol. III, doc. 68 at 46, 48. Nevertheless, the court declined to vacate Mr. Mitchell's death sentence. Citing *Romano v. Oklahoma*,

---

[10] Mr. Mitchell did not develop these facts in state court. Under AEDPA, a petitioner in these circumstances is not entitled to an evidentiary hearing in federal court unless he shows that the "factual predicate could not have been previously discovered by the exercise of due diligence" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254e(2). The state did not argue either before the district court or on appeal that Mr. Mitchell failed to satisfy the requisites of this provision.

512 U.S. 1, 13 (1994), the court concluded that such relief was not warranted because "[t]he jury had sufficient evidence to justify its conclusion that the three aggravating circumstances it found were present, even without the rape and sodomy convictions." Rec., vol. III, doc. 68 at 51.

Mr. Mitchell argues on appeal that the district court used an incorrect legal standard in evaluating the impact of the withheld exculpatory evidence on the jury's sentencing determination. He contends the proper inquiry is that set out in *Kyles v. Whitley*, 514 U.S. 419 (1995), under which "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985), (Blackmun, J., concurring)). Given the district court's finding that this case involves the knowing presentation by the prosecution of false evidence or argument, Mr. Mitchell further argues relief is required "if the 'false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

In response, the state does not assert that the findings upon which the district court relied in striking down the rape and sodomy convictions are clearly

erroneous. Nor does the state take issue with the district court's holding that a *Brady* violation occurred, necessitating the vacation of those convictions. Rather, the state contends the district court properly relied on *Romano* in refusing to vacate the death penalty, arguing that the appropriate inquiry for assessing whether a *Brady* violation merits habeas relief is "whether the State's evidence in support of the three alleged aggravators was such that, even without consideration of the rape and sodomy convictions, the jury had sufficient evidence to support its conclusion that the aggravators were present." Br. of Aplee. at 4. Finally, the state contends the district court correctly determined under this standard that vacation of the rape and sodomy convictions does not require vacation of the death penalty.

When, as here, the state courts have not heard the claim on the merits, "we review the district court's legal conclusions de novo and its factual findings, if any, for clear error." *Hale*, 227 F.3d at 1309.[11] We first determine whether the district court erred in assessing the impact of the *Brady* violation under the standard set out in *Romano* rather than that set out in *Kyles*. We conclude that *Kyles* provides the proper analysis. *Romano* was not concerned with either a *Brady* violation or with the knowing presentation of false evidence and it is

---

[11] Mr. Mitchell asserts the state waived exhaustion of this claim in district court. The state does not dispute this assertion on appeal.

therefore simply inapposite. [12] Here, the state withheld exculpatory evidence and the issue is therefore governed by the analysis set out in *Kyles*, which specifically addresses the showing a habeas petitioner must make to obtain relief in these particular circumstances. We have previously applied the standard articulated in *Kyles* to alleged *Brady* violations asserted by petitioners on habeas. *See Romano v. Gibson*, 239 F.3d 1156, 1172 (10th Cir. 2001) (*Brady* evidence material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). We have

_____

[12] In *Romano*, in order to support the aggravating circumstance that the defendant had been convicted of a prior violent felony, the jury was told that the defendant had previously received the death penalty in a case that was currently on appeal. This information was correct at the time although the conviction was subsequently overturned. The Supreme Court rejected the defendant's claim that this evidence rendered his sentencing so unreliable as to violate the Eighth Amendment. The Court pointed out the state court had struck the unsupported aggravator and had reweighed the remaining untainted aggravators to conclude the death penalty was still warranted. *See Romano*, 512 U.S. at 11. No such reweighing occurred here. Moreover, the Court in *Romano* went on to hold the proper analytical framework in the circumstances before it was that found in *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974), in which the Court assessed whether a prosecutor's closing argument was so prejudicial as to deny the defendant due process. *Romano*, 512 U.S. at 12. In *Donnelly*, the Court distinguished between prosecutorial misconduct that denies a defendant a specific constitutional right and that which does not, holding that when a specific right is not infringed the defendant is entitled to relief only upon showing the misconduct so infected the entire proceeding as to make the result a denial of due process. *See Paxton*, 199 F.3d at 1217-18. Here, the district court concluded the state's misconduct deprived Mr. Mitchell of the right to cross-examination and to present mitigating evidence, resulting in trial by ambush. Because specific constitutional rights were infringed, even under *Romano* Mr. Mitchell is entitled to relief without showing the entire sentencing was rendered fundamentally unfair.

discovered no case in which we applied the *Romano* test used by the district court to such a claim.  Accordingly, we conclude that the district court applied the wrong standard in assessing whether the vacated convictions impermissibly tainted the jury's imposition of the death penalty. [13]

In *Kyles*, the Supreme Court reiterated and explained its prior holding that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 667, 682 (1985) (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in judgment)).  The Court emphasized four aspects of materiality from its prior precedents, *see id.* at 434, two of which are particularly pertinent here.

_____

[13] Mr. Mitchell argues that because this case presents the situation in which the prosecutor knowingly presented false testimony, his claim should be evaluated under the less demanding standard of *Giglio v. United States*, 405 U.S. 150 (1972), in which the Court held that the presentation of false evidence, whether knowing or unknowing, requires a new trial "if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Id.* at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).  Assuming the *Giglio* "reasonable likelihood" standard is in fact less demanding than the *Kyles* "reasonable probability" standard, a petitioner who succeeds under that standard will still have to meet the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which the Supreme Court has held is met by the *Kyles* test.  *See Kyles*, 514 U.S. at 435-36.  Thus for all practical purposes the two standards ultimately mandate the same inquiry.  *See Gilday v. Callahan*, 59 F.3d 257, 267-68 (1st Cir. 1995).

First, the Court pointed out that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* The court expressly rejected a standard that would require a defendant "to demonstrate that the evidence if disclosed probably would have resulted in acquittal." *Id.* (citation omitted). The Court cautioned that

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* (quoting *Bagley*, 473 U.S. at 678).

Second, the Court emphasized that materiality under *Bagley* "is not a sufficiency of the evidence test." *Id.*

> A defendant need not demonstrate that after discounting the inculpatory evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* at 434-35.

Thus the state and the district court are wrong as a matter of law in stating that Mr. Mitchell is not entitled to vacation of his death penalty because the jury had sufficient evidence to justify its sentence even without the rape and sodomy convictions. The appropriate inquiry under *Bagley* and *Kyles* is whether the favorable evidence the jury never heard creates a reasonable probability that the sentencing outcome would have been different. This involves an assessment of the withheld evidence "in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). In determining whether we can be confident the jury would have returned a death sentence had it known Mr. Mitchell did not rape or sodomize the victim, we bear in mind that "'[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles*, 514 U.S. at 422 (quoting *Burger v. Kemp*, 483 U.S. 775, 785 (1987); *see also Banks*, 54 F.3d at 1521 (same).

In striking down the rape and sodomy convictions, the court relied on the following factual findings, which are equally relevant to our inquiry here. Joyce Gilchrist, a forensic chemist with the Oklahoma City Police Department, testified she found six sperm on the vaginal swab taken from the victim but was unable to identify any donor. She found ten sperm on the rectal swab and determined the

donor had the same blood type as both Mr. Mitchell and the victim's boyfriend, Phillip Taylor. She also stated that blood, semen and sperm found on the sheet in which the victim's body had been transported from the crime scene were consistent with both men, as were semen stains on the victim's panties. Finally, she testified that a viable semen or sperm sample would be present in a woman's body for up to twelve hours after intercourse if she were up and moving around. This latter testimony is significant because the jury had been told that Mr. Taylor had not had sexual relations with the victim for the last eight days.

Ms. Gilchrist had sent the swabs and cuttings from the panties to Special Agent Michael Vick in the FBI laboratory DNA unit. The laboratory performed DNA testing on these items and prepared a report, which was couched in convoluted language that did not clearly recite the test results. Ms. Gilchrist characterized the report at trial as inconclusive. Ms. Gilchrist also sent samples to Mr. Brian Wraxall at the Serological Research Institute in California, who determined the samples either were too small to test or did not contain semen at all.[14]

---

[14] Mr. Wraxall did, however, confirm the presence of sperm on the sheet and a pubic hair sample which were consistent with Mr. Mitchell and inconsistent with Mr. Taylor. This evidence is consistent with Mr. Mitchell's testimony that he masturbated in the presence of the victim after C. Ray urged him to sexually assault her.

Mr. Mitchell requested and received permission to conduct discovery in this habeas proceeding. As a result, he obtained *hand-written notes taken by Ms. Gilchrist during telephone conversations with Agent Vick indicating that the agent had conducted two DNA probes on the samples*. These probes showed that the semen on the panties matched that of Mr. Taylor only, that no DNA was present on the rectal swab, and that the only DNA on the vaginal swab was consistent with the victim. The *results thus completely undermined Ms. Gilcrhist's testimony*.

The district court held an evidentiary hearing, at which Agent Vick admitted there was no way to tell from his report that he had obtained no DNA results from the rectal swab, no DNA profile other than that of the victim on the vaginal swab, and no DNA profile other than that of the victim and Mr. Taylor on the panties. An expert testified at the evidentiary hearing that the DNA testing performed by Agent Vick unquestionably eliminated Mr. Mitchell as a source of the sperm. This expert reviewed Ms. Gilchrist's trial testimony implicating Mr. Mitchell through her testing and that of Mr. Wraxall, and stated that the testimony was based on the use of test methods Ms. Gilchrist knew were less precise than the DNA tests which eliminated Mr. Mitchell. Moreover, he pointed out that one of the tests she performed in fact excluded Mr. Mitchell. Mr. Mitchell was not provided the actual test results developed by Agent Vick or the notes taken by

Ms. Gilchrist indicating her knowledge that Mr. Mitchell had been excluded by the FBI's DNA testing.

*Ms. Gilchrist thus provided the jury with evidence implicating Mr. Mitchell in the sexual assault of the victim which she knew was rendered false and misleading by evidence withheld from the defense. Compounding this improper conduct was that of the prosecutor, whom the district court found had "labored extensively at trial to obscure the true DNA test results and to highlight Gilchrist's test results," and whose characterization of the FBI report in his closing argument was "entirely unsupported by evidence and . . . misleading. "* Rec., vol. III, doc. 68 at 46-47. As a result, the jury convicted Mr. Mitchell of rape and forcible anal sodomy despite evidence it did not hear indicating that no such assault had taken place.

We are compelled to address the obvious by pointing out that the state's conduct in this case strikes a heavy blow to the public's "trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles*, 514 U.S. at 439 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The Supreme Court has cautioned that proper disclosure under *Bagley* is required in order "to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal

accusations." *Id.* at 440.  Nonetheless, as the state takes pains to point out on appeal, our task is not to impose punishment for improper behavior but to assess whether the improperly withheld evidence raises a reasonable probability that, had it been disclosed to the jury, the result of the sentencing proceeding would have been different.

At the commencement of the sentencing proceeding, the state asked the court to incorporate all the evidence presented in the guilt stage so that the jury could consider everything it heard during that phase in assessing punishment.  In its closing argument to the jury in the guilt stage, the state had voiced its intent to focus on the murder, rape and sodomy charges, and at several points in that argument the state had tied the three charges together.  In so doing, the state referred to bruising on the victim's hips as "consistent with a 250 pound man raping a woman against her will."  Trial Trans., vol. VII at 1335.  The state also asserted "the defendant had learned his lesson the last time.  The last time he left a witness alive and he ended up at the Rader Center incarcerated.  He wasn't going to let that happen this time.  Ladies and gentlemen, there was never any question that Elaine Scott was to die."  Trial Trans., vol. VIII at 1438.  Finally, the state told the jury, "[w]e know what his idea of sex is.  It includes power, violence, humiliation, degrading his victim.  That's what he was after."  *Id.* at 1464.

At the beginning of the sentencing stage, the state again told the jury that Mr. Mitchell had learned from his earlier rape adjudication, arguing that he killed Ms. Scott to avoid arrest and prosecution for his sexual assault. "After he was through with Elaine Scott, after he had his way with her, knowing that she knew him, knew who he was, the fact that she was afraid of him before, he murdered her, he beat her to death, because she was the only living witness to the crime that he had committed." Sent. Trans. at 8.[15]

In view of the district court's unchallenged findings and conclusions vacating the rape and sodomy convictions, there is at least a reasonable probability that if the defense had been provided the withheld evidence, it would have succeeded in getting those charges dismissed prior to the trial.[16] Sexual assault charges are by their nature highly inflammatory and prejudicial. As Mr. Mitchell's defense counsel pointed out at the federal evidentiary hearing, in representing a capital defendant there is a qualitative difference in terms of

---

[15] The sentencing proceeding itself was transcribed separately from the sequential volumes of the guilt phase of the trial and the closing arguments in the sentencing stage.

[16] Even if Mr. Mitchell had proceeded to trial on the charges, Ms. Gilchrist's notes of her conversations with Agent Vick, which indicated her knowledge that the DNA testing excluded Mr. Mitchell, would have provided very effective ammunition in defense counsel's ability to impeach her credibility. In our view, depriving defense counsel of the ability to demonstrate the untruthfulness of Ms. Gilchrist's critical testimony to the jury also raises a reasonable probability that the outcome of the proceedings would have been different with respect to the rape and sodomy convictions.

culpability between a defendant who rapes and sodomizes a victim and then kills her to silence her, and a defendant who kills in a fit of rage. Had the rape and sodomy charges not been before the jury, the state would have been unable to infuse the murder with prior sexual abuse or to argue that Mr. Mitchell killed the victim in a premeditated plan to avoid arrest and prosecution. All of the highly charged arguments that we have recited above would not have been presented to the jury. Both the guilt and sentencing stages would necessarily have had an entirely different focus and character.

These circumstances undermine the fairness of the sentencing proceeding that resulted in Mr. Mitchell's death sentence; we simply cannot be confident that the jury would have returned the same sentence had no rape and sodomy evidence been presented to it. First and foremost, the rape and sodomy evidence impacted all three of the aggravating circumstances found by the jury: that the murder was heinous, atrocious and cruel; that it was committed to avoid arrest for the rape and sodomy; and that Mr. Mitchell posed a continuing threat to society. Moreover, the defense presented considerable mitigating evidence for the jury to weigh against the aggravating circumstances it found. That evidence included Mr. Mitchell's youth (18); his loving relationships with his extended family and friends, which showed a totally different side of his character; and his intelligence (he had been in a program for the gifted and talented children in his elementary

school). In addition, Dr. Wanda Draper, a psychologist with a PhD in human development, testified at the sentencing hearing about Mr. Mitchell's developmental history, concluding that he would do well in a structured environment such as the one he experienced in the juvenile facility where he was a leader among his peers. This evidence enabled defense counsel to argue that Mr Mitchell's life was worth saving and that he would do well in a prison environment if the jury sentenced him to life without parole. Under these circumstances, we are persuaded Mr. Mitchell has met the *Kyles* standard by showing that absent the *Brady* violation, there is a reasonable probability the result of the sentencing proceeding would have been different. *See Kyles*, 514 U.S. at 435. Mr. Mitchell is therefore entitled to habeas relief on this claim.


## VIII

### Conclusion

In sum, we **AFFIRM** the district court's rulings denying Mr. Mitchell's challenges to his conviction for first degree murder and we deny his request for habeas relief on those claims. We **REVERSE** the court's ruling upholding imposition of the death penalty and grant Mr. Mitchell's petition for habeas relief on his claim that his sentence violated his right to due process. Accordingly, we

**GRANT** a conditional writ of habeas corpus requiring that Mr. Mitchell be resentenced.