**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

TERRY LYN SHORT,

                    Petitioner - Appellant,

v.                                                          No. 04-6299

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

                    Respondent - Appellee.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-00-749-T)**

---

John Dexter Marble (Gary M. Chubbuck and Susan F. Kane with him on the
briefs), Chubbuck Smith Rhodes Stewart & Elder, Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with him on the brief), for Respondent-Appellee.

---

Before **TACHA**, **HENRY**, and **McCONNELL**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Terry Lyn Short was convicted after a jury trial in the District Court for

Oklahoma County of first-degree murder and five counts of attempting to kill

after former conviction of two or more felonies in violation of Okla. Stat. tit. 21, §§ 701.7, 652. As to the murder conviction, the jury found three aggravating circumstances, and the trial court imposed the death penalty. The Oklahoma Court of Criminal Appeals (OCCA) affirmed Mr. Short's convictions and sentences on direct appeal, *Short v. State*, 980 P.2d 1081 (Okla. Crim. App. 1999), and also denied his motion for post-conviction relief.

Subsequently, Mr. Short filed a 28 U.S.C. § 2254 habeas corpus petition in the United States District Court for the Western District of Oklahoma, asserting fifteen grounds for relief. The district court denied Mr. Short's petition, but, pursuant to 28 U.S.C. § 2253(c)(1)(A), granted a certificate of appealability on five of his claims. Mr. Short now argues that (1) the trial court's exclusion of testimony of a defense witness, which the trial court imposed as a sanction for failure to comply with a discovery order, violated his Sixth Amendment Compulsory Process Clause right; (2) the jury heard improper victim impact evidence that resulted in an unconstitutional sentencing process; (3) prosecutorial misconduct during the sentencing phase violated his due process rights; (4) his counsel provided ineffective assistance when he failed to object to the unconstitutional portions of the victim impact evidence and to repeated instances of prosecutorial misconduct; and (5) viewing the above errors collectively, the totality of the proceedings was unjust and that these errors substantially prejudiced the jury's deliberations at sentencing.

2

Upon thorough review of the record and the applicable law, we conclude that Mr. Short is not entitled to relief on any of his claims. We therefore affirm the district court's denial of his § 2254 petition.

## I. FACTUAL BACKGROUND

The following facts are largely taken from the direct appeal opinion of the OCCA. *Short*, 980 P.2d at 1089-90. Mr. Short was convicted of the murder of Ken Yamamoto. Mr. Yamamoto lived in an Oklahoma City apartment directly above that of Mr. Short's former girlfriend, Brenda Gardner, her sister Tammy Gardner, and Tammy's two minor children. After a fire started in Tammy's apartment, Brenda, Tammy, and the children escaped. Robert Hines, the former husband of Brenda's sister, Peggy, and the father of one of Tammy's children, was also present and escaped with injuries.

The fire spread quickly causing Mr. Yamamoto's apartment to collapse. Mr. Yamamoto, who had been sleeping, suffered burns to ninety-five percent of his body. He was conscious when taken to the hospital, but he died several hours later.

### A. Mr. Short's relationship with Brenda

Marjorie Long, Brenda's mother, testified that in 1994 she rented an Oklahoma City apartment to Brenda and Mr. Short, an employee of Two Guys Auto, an auto repair shop. She stated that after Mr. Short ransacked the bedroom

3

and broke a window, she took his name off the lease. She testified that in August or September of 1994, Mr. Short threw rocks at her car when she was driving with Brenda, and also tried to run her off the road. Mr. Short pulled up next to her car and when Brenda refused to talk to him, he said, "I'll just get some gas and pour [it] on your mother and set her on fire." Rec. vol. III, at 126. Brenda also testified that Mr. Short had threatened her and her family. She also stated that, at another time, he had shown her how to make a firebomb, using a bottle, gasoline, wax, and a towel.

The prosecution presented testimony from Oklahoma City police officer Sergeant Chuck Wheeler about Mr. Short's threatening behavior. Sergeant Wheeler stated that, on December 26, 1994, he answered a call that a female, Brenda, was being held against her will by a male, Mr. Short. Sergeant Wheeler took Brenda to her sister's apartment, despite Mr. Short's protests.

Brenda admitted to having broken up with Mr. Short on December 26, 1994. However, she saw him almost daily from December 28 through January 4, 1995, when she and Mr. Short were charged with shoplifting.

Brenda's sister Janet testified that she accompanied Brenda to court on the shoplifting charge. According to Janet, Mr. Short was getting angry and wanted Brenda to "[t]ake the rap for it." *Id.* at 144. She stated that he "[s]aid she'd better or else." *Id.*

Mr. Hines also went to the courthouse on January 4, and told Mr. Short,

4

"Don't be threatening my family." *Id.* at 233. According to Mr. Hines, Mr. Short started threatening Mr. Hines at that point.

Mr. Short's aunt testified that about three days before the fire, she had seen Mr. Short in a red coat that was stained with gasoline and oil. She testified that the coat – an exhibit in the case – looked about the same as before the fire.

Finally, Keith Partain, a friend of Mr. Short's for fifteen years, testified that about a week before the fire, Mr. Short remarked that "he was going to burn Brenda and her family up." Rec. vol. IV, at 137. Mr. Partain thought Mr. Short was joking when he said this. When Mr. Partain saw Mr. Short on the day before the fire, Mr. Short seemed depressed about having broken up with Brenda. However, Linda Gonzalez, another friend, testified she saw him at about 7 p.m. that evening and that he seemed to be "happy like he always is." *Id.* at 143.

**B. The events of January 8, 1995**

Brenda Gardner testified that on January 8, 1995, at about 3:00 a.m., she and her sister were in the apartment with the two sleeping children. Brenda heard a noise at the front door as though someone was trying to break in. She yelled out, and it stopped.

Sometime in the next thirty minutes, Mr. Hines arrived at the apartment. He tried enter through the front door, which was jammed. Tammy let him in through the patio door.

At about 4:00 a.m., Brenda looked out the patio door and noticed Mr. Short standing by Mr. Hines's truck. Brenda testified Mr. Short was wearing a red jacket. She testified that Mr. Hines also looked out the patio door. Mr. Hines first stated at trial that he was certain the man was Mr. Short. On cross-examination, however, Mr. Hines admitted he *assumed* the person outside was Mr. Short because Brenda and her sister Tammy told him that Mr. Short had been outside the apartment earlier that evening.

Brenda stated that Mr. Short turned his back, and appeared to be lighting a cigarette. "Then I seen a bigger flame, and at that time I looked up at Robert, and then the next thing I know the window was shattered and Robert was on fire." Rec. vol. III, at 168. She did not see Mr. Short throw anything, however. After getting the children, Brenda called 911 and told them her ex-boyfriend had thrown a bomb in the apartment.

## C. The investigation of Mr. Yamamoto's death

Later that day, Mr. Short telephoned his cousin, David Davis. Mr. Short asked Mr. Davis to pick him up. Apparently, Mr. Short had seen news reports of the fire, and was scared of the city police because of previous "run-ins." Rec. vol. IV, at 93. At Mr. Short's request, Mr. Davis brought Mr. Short a change of clothes. Mr. Davis testified that Mr. Short denied being involved in the fire bombing. After Mr. Short had changed, he surrendered to the Oklahoma City police.

6

Oklahoma City Detective Mike Burke testified that when Mr. Short came into the Oklahoma County jail, he was not wearing socks. Detective Burke searched Mr. Davis's vehicle and retrieved a red coat that tested positive for gasoline. The coat contained three disposable lighters, some rolling paper, and a package of leaf tobacco. Mr. Short's sneakers also tested positive for gasoline. Detective Burke found no socks in the vehicle.

Homicide Detective Robert Mark Easley testified about his investigation. He searched what had been Mr. Short's registered room at the Melrose Motel. Inside a white plastic bag, Detective Easley found some clothing, and a bottle of lighter fluid. He also recovered a legal pad that contained some writing about Brenda. Excerpts, as read by Detective Easley, included:

> 1-4-95 . . . the last time I seen her.
> 1-5-95 . . . still no word from her. My life is over with her and I know it, but I do love her.
> 1-7-95, still no word from her. I guess she found somebody else. I only hope I know I still have a chance as long as she did not have sex with nobody.
> 1-8-95 . . . I need her to go on in my life. She is all I got.

*Id*. at 111-112.

Detective Easley also identified photographs he took of items in the motel room, including a bottle cap without the liner, one with the liner, the blue liner to a bottle cap, and an empty two-liter bottle of RC Cola.

**D. Testimony of Mr. Brown**

Mr. Short spent several days in a holding cell at the Oklahoma County jail.

7

Another occupant of the holding cell, Jay Brown, who had been arrested for distribution of marijuana, testified that he met Mr. Short there. According to Mr. Brown, there were about twenty-two people in the cell. Mr. Brown testified that he saw Mr. Short write "die, Brenda G," "Brenda G is a slut," and "burn Brenda G" on the cell's walls. Rec. vol. IV, at 171-72. Those writings are evident in the photographs of the cell taken later by Detective Easley.

Mr. Brown testified that after discovering his brother was an attorney, Mr. Short asked if fingerprints would appear on a bottle when one's fingers were taped. Mr. Brown also testified that Mr. Short told him that one day he caught Brenda having sexual intercourse with her brother-in-law and that Mr. Short then returned to Two Guys Auto. Mr. Brown testified:

> I think [Mr. Short] said he looked for a gun . . . somehow it was locked or something, so he came up with the idea to use a Coke bottle and a sock. He put gasoline in the Coke bottle, put the sock in the gasoline and put it in there. Went back to the apartment, opened the door, threw the bottle, – watched it hit . . . shut the door so they wouldn't be able to run out and left.

*Id.* at 173. Mr. Short told Mr. Brown that, before shutting the door, he saw the bottle hit a man in the apartment in the head. Mr. Brown testified that Mr. Short was nicknamed "Fireball" within the cell. *Id.* at 189.

Mr. Brown testified that he believed that he was originally facing a sentence of five years to twenty-five years. After his testimony in this and another case, he received a five-year deferred sentence.

8

**E. Proffered testimony of Mr. Bayless**

On April 10, 1997, after Mr. Brown testified and the prosecution rested, the defense attempted to introduce the testimony of Mark Bayless, another occupant of the Oklahoma County jail's holding cell. On April 7, 1997, three days earlier, defense counsel had notified the prosecution of its intent.

> According to defense counsel, Mr. Bayless
>
> was present during the entire time that Jay Brown and Terry Short were together. *He'll refute every single word that Jay Brown testified to.* He also will testify that the drawings and the writings were done by someone else, not Terry Short, and that Jay Brown's a liar.
>
> . . . . In [a] criminal case a snitch or a government informant witness is the most suspicious sort of witness . . . because he is the only person on the face of the earth that the state claims Terry Short confessed to, and . . . his testimony . . . is very critical to the state's case.

*Id.* at 193 (emphasis added).

Defense counsel stated that the first time he ever knew about the photographs of the holding cell was on March 31, 1997, despite Mr. Brown's having testified at the preliminary hearing over a year and a half earlier. "I immediately had . . . an investigator in our office[] search for prisoners who were present during that period of time." *Id.* The State did not attempt to interview Mr. Bayless after being notified about him.

The State responded that Mr. Bayless could not refute what Mr. Short told Mr. Brown. It reiterated that the photographs had been made available to defense counsel for over a year, and that current defense counsel had been in the

9

prosecutor's office to review files more than two weeks earlier.

Defense counsel responded:

The nature of Mr. Bayless's testimony is a direct refutation of this government informant or snitch. . . .

The remedy . . . which would correct the situation would be to allow the state to talk to this witness.  But in a capital murder case where a discovery violation has occurred . . . then there are several remedies, and one is to recess the case in order to give us time to investigate what is a terribly harsh penalty to punish Terry Short with any defects in his lawyers.

[H]is testimony is crucial . . . .  because [t]hey have not talked about any admissions by Terry Short admitting to the crime. . . .

*Id.* at 194-95.

Defense counsel then clarified that Mr. Bayless would state "that Terry Short did not draw that obscene picture on the wall, that he did not write, [']burn, Brenda, burn['] on the wall, those are two things that he saw someone else do, he's willing to testify to it, and it's relevant and it's crucial to the defense." *Id.* at 198-99.

The trial court agreed with the prosecution that "there's no way he could know and tell the jury what the defendant did or did not tell Jay Brown." *Id.* at 199.  The court concluded that cross-examination provided enough opportunity to challenge Mr. Brown's credibility.  The court also rejected defense counsel's argument that Mr. Bayless might be a rebuttal witness.

**F. Expert testimony**

10

The prosecution presented testimony from fire investigator David D. Dallas regarding the fire's origin. Mr. Dallas testified that the fire began in front of the patio door on the interior of the apartment. He stated that the fire was caused by a "fire bomb device . . . thrown into the apartment through the patio door [that] caused burning inside the apartment on the ground floor." Rec. vol. IV, at 43.

Mr. Dallas discussed a piece of aluminum that melted from the patio door. The piece indicated that the aluminum melted first and ignited a nearby bed, which was the secondary source of fuel. The aluminum contained jute from the carpet and the remains of an ashtray that was near the bed. There was also evidence of cigarettes and a book of matches nearby.

Mr. Dallas testified that he was able to eliminate the possibility of a smoker-related fire because of the pattern of the melted aluminum. The aluminum also contained some thin glass on the bottom, which meant the glass was there before the aluminum melted on it. According to Mr. Dallas, "[t]his glass on the bottom is from [the] suspected container." *Id.* at 50. A thicker fragment of glass was consistent with the bottom of a soft drink container, but Mr. Dallas could not identify the size of the container. Mr. Dallas found no traces of an accelerant in or around the areas of the fire's origination. He could not confirm that the container ever held an accelerant.

As to the pattern of the fire, Mr. Dallas testified that a Molotov cocktail would result in "two areas of severe burn": (1) liquids would accumulate at the

11

door and (2) some would pass on with the container as it entered the interior of the room. *Id.* at 54. In the apartment, there were two areas of origination, one that started from accelerated temperature and concrete at the threshold of the patio door, and a second about two feet away from the patio door. Mr. Dallas could not identify the glass from the patio door as tempered glass, but noted that its thickness supported that conclusion.

He saw no evidence of a methamphetamine lab explosion, a possibility advanced by Mr. Short. Rather, Mr. Dallas testified that an accelerant started the fire. He conceded that some ingredients or precursors of methamphetamine could be classified as accelerants.

Defense counsel presented testimony from criminologist Patricia Eddings who stated that the evidence at the scene was not consistent with a fire bomb. She noted that it was unlikely that a soda bottle would break the patio door's tempered glass, and then shatter on the carpeted floor. Ms. Eddings also noted that the glass the prosecution identified as consistent with the base of a soda bottle had no characteristic markings and was more consistent with a drinking glass.

When she examined Mr. Hines's clothing, she noted that the upper front pocket of his jeans contained a baggie of methamphetamine. Mr. Hines had admitted to having used drugs earlier on January 7 and 8 and to having methamphetamine in his trousers and in his truck. Ms. Eddings testified that Mr.

12

Hines's burns were more consistent with a kitchen-type cooking fire. Another fire investigator, George Hale, also testified that Mr. Hines's injuries were only on the upper portion of his body.

## G. The jury's findings

A jury found Mr. Short guilty of the first-degree murder of Mr. Yamamoto and five counts of attempting to kill after former conviction of two or more felonies. The jury recommended imposition of the death penalty for the murder after finding the existence of three aggravating circumstances: (1) Mr. Short knowingly created a risk of death to more than one person; (2) the murder was especially heinous, atrocious, or cruel; and (3) Mr. Short constituted a continuing threat to society. The jury recommended three 100-year sentences and two 200-year sentences for the attempting-to-kill offenses.

## II. STANDARD OF REVIEW

If a claim was adjudicated on the merits in state court, we review the state court ruling under the deferential standard of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). Under AEDPA, a petitioner is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of

13

the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)-(2). In conducting this inquiry, we presume the factual findings of the state trial and appellate courts are correct, and we place the burden of rebutting this presumption by clear and convincing evidence on the petitioner. *Id.* § 2254(e)(1). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." *Id.*

When the state court has not previously addressed the merits of the claim for relief, the § 2254 framework does not apply. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). Instead, we review the district court's legal conclusions de novo and its factual findings for clear error. *Id.* If the district court's factual findings depend entirely on the state court record, we independently review that record. *Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000).

### III. DISCUSSION

Mr. Short raises one guilt-phase error (a violation of his Sixth Amendment rights through the exclusion of testimony of his cellmate, Mr. Bayless), and four sentencing-stage errors (admission of improper victim-impact evidence, prosecutorial misconduct, ineffective assistance of counsel, and cumulative error).

14

We review each contention in turn.

## A. Sixth Amendment violation

Mr. Short contends that the exclusion of Mr. Bayless's testimony violated his Sixth Amendment Compulsory Process Clause right and unconstitutionally prejudiced the jury's deliberations during the guilt and sentencing stages. The Compulsory Process Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI; *see Taylor v. Illinois*, 484 U.S. 400, 409 (1988) ("To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.") (quoting *Unites States v. Nixon*, 418 U.S. 683, 709 (1974)).

### 1. Exclusion of Mr. Bayless's testimony at the guilt stage

Mr. Short argues that the trial court's exclusion of Mr. Bayless's testimony violated his Sixth Amendment right to compulsory process. As the OCCA noted, Oklahoma law permits exclusion of evidence for failure to comply with discovery rules. Under Okla. Stat. tit. 22, § 2002(D), "[a]ll issues relating to discovery, except as otherwise provided, will be completed at least ten (10) days prior to trial. The court may specify the time, place and manner of making the discovery and may prescribe such terms and conditions as are just." Specifically, under Oklahoma law:

15

> *If at any time during the course of the proceedings* it is brought to the attention of the court that a party has failed to comply with this rule, *the court may order* such party to permit the discovery or inspection, grant continuance, *or prohibit the party from introducing evidence not disclosed,* or it may enter such other order as it deems just under the circumstances.

OKLA. STAT. tit. 22, § 2002(E)(2) (emphasis added); *see e.g., Wilkerson v. Dist. Court of McIntosh County*, 839 P.2d 659, 661 (Okla. Crim. App. 1992). Oklahoma's "Code gives trial courts discretion to specify the time, place, and manner" of complying with discovery requirements. *Rojem v. State*, 130 P.3d 287, 297 (Okla. Crim. App. 2006). However, "[a]lthough the criminal discovery code provides for exclusion of evidence as a sanction for non-compliance, this Court has found in several *capital* cases that the exclusion of a defense witness was *too severe* a sanction." *Id.* (emphasis added) (internal quotation marks omitted).

Under the circumstances here, the OCCA agreed that preclusion of Mr. Bayless's testimony was an appropriate sanction.

> Based upon the record before us, we are unable to determine that the preclusion of Bayless's testimony was not an appropriate sanction. The preliminary hearing in this case was held approximately one year and a half prior to trial. Brown testified at the preliminary hearing and gave essentially the same testimony as he did at trial. [Mr. Short] *has failed to explain why he did not notify the State about Bayless's testimony until the start of trial.*
>
> *Further, Bayless was not a material witness.* He was not a party to the conversations between Brown and [Mr. Short]. Therefore, he could not testify as to the truthfulness of Brown's testimony regarding [Mr. Short's] confession. At most, Bayless could impeach Brown only as to

16

the testimony regarding who drew the pictures on the jail cell wall. Bayless was not a witness to the actual crime and therefore could not have refuted the testimony of the eyewitnesses. *Because Bayless was not a material witness, and as [Mr. Short] has failed to establish that he was substantially prejudiced by the exclusion of the testimony, we find no error in the trial court's ruling.*

*Short*, 980 P.2d at 1193-94 (emphasis added).

In addition, the OCCA concluded that

under usual trial proceedings, rebuttal is an opportunity for the State to present witnesses, for whom no notice is required, to rebut the defense case-in-chief. The defense does not present rebuttal witnesses until surrebuttal. Bayless's testimony does not qualify as surrebuttal evidence.

*Id.* at 1094. Because Mr. Bayless was not a material witness, and because Mr. Short could not establish that he was substantially prejudiced by the exclusion of the testimony, the OCCA found "no error in the trial court's ruling." *Id.* Because the OCCA applied the correct governing legal principle to Mr. Short's case, we review its ruling under the highly circumscribed constrictions of AEDPA.

*a. Defense counsel's actions with respect to Mr. Bayless*

The record indicates that Wesley Gibson first represented Mr. Short. Some time after the preliminary hearing (which took place on August 23 and September 5, 1995), Mr. Gibson suffered a stroke and was unable to continue as Mr. Short's attorney. Jim Rowan was assigned to the case and served as Mr. Short's counsel at trial. The record does not reveal exactly when Mr. Rowan began representing

17

Mr. Short. Apparently, no entry of appearance was filed. The first indication of Mr. Rowan's involvement appears on a "Petition for Order" filed September 19, 1996, a little over six months before the trial. *See* Aplt's Br. at 32 n.12 (referencing state postconviction proceedings, filed Apr. 29, 1998).

### b. Compulsory process

The Sixth Amendment does not confer "an unfettered right to offer testimony that is incomplete, privileged, or otherwise inadmissable under standard rules of evidence." *Taylor*, 484 U.S. at 410. "The defendant's right to compulsory process is itself designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" *Id.* at 411 (quoting *Nixon*, 418 U.S. at 709). However, "few rights are more fundamental than that of an accused to present witnesses in his own defense and the preclusion of material defense witnesses from testifying is the severest sanction for discovery violations." *Wilkerson*, 839 P.2d at 661 (citing *Taylor*, 484 U.S. 400).

The *Taylor* Court noted that there is not "a comprehensive set of standards to guide the exercise of discretion in every possible case." 484 U.S. at 414. However, paramount considerations are "[t]he *integrity of the adversary process,* which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the *potential prejudice* to the truth-determining function of the trial process."

18

*Id.* at 414-15 (emphasis added). Further, if the delay "was *willful and motivated by a desire to obtain a tactical advantage* that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," exclusion would be "entirely consistent" with the purposes of the Compulsory Process Clause. *Id.* at 415 (emphasis added).

In applying Supreme Court precedent to compulsory process challenges to a trial court's exclusion of evidence, this court has undertaken a three-part inquiry. *See e.g.*, *United States v. Wooten*, 377 F.3d 1134, 1141 (10th Cir. 2004); *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997). First, we examine whether the excluded testimony was relevant. If so, we ask "whether the state's interest in excluding the evidence outweighed [the defendant's] interest in its admittance." *Richmond*, 122 F.3d at 872. Finally, we consider "whether the excluded testimony was material, whether the excluded testimony was of such an exculpatory nature that its exclusion affected the trial's outcome." *Id.* These "three factors merely guide the district court and do not dictate the bounds of the court's discretion." *United States v. Russell*, 109 F.3d 1503, 1511 (10th Cir. 1997).

### c. The OCCA's application of Taylor v. Illinois

In determining whether the OCCA unreasonably applied federal law in rejecting Mr. Short's compulsory process claim, we must decide whether the OCCA's decision was unreasonable, not whether it was correct. *See Mitchell v.*

19

*Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001) (distinguishing between these two inquiries); *Watley v. Williams*, 218 F.3d 1156, 1159 (10th Cir. 2000) (observing that "[r]easonable minds may disagree about the appropriateness of excluding an alibi witness whom Petitioner's counsel did not willfully omit, but under AEDPA we are limited to applying existing Supreme Court precedent" and holding that "the New Mexico Court of Appeals reasonably applied *Taylor v. Illinois*").

(i)  Relevance

Under Oklahoma law, "[r]elevant evidence" is that which has "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OKLA. STAT. tit. 12, § 2401; *see Phillips v. State*, 989 P.2d 1017, 1030 (Okla. Crim. App. 1999) (applying the relevance standard).  In order to determine whether Mr. Bayless's testimony would have been relevant, we must first consider the testimony of Mr. Brown—the witness whose testimony defense counsel sought to impeach through Mr. Bayless.  The OCCA held that the photographs of the holding cell, including the drawings and inscriptions, introduced during the testimony of Detective Easley, were properly admitted. The court's determination of the photographs' relevance was based exclusively upon Mr. Brown's testimony.  According to the OCCA, the drawings corroborated Mr. Brown's testimony regarding Mr. Short's authorship of the

20

inscriptions.  Mr. Brown also testified that he observed Mr. Short draw sexually explicit pictures of a woman on the cell's walls.  Mr. Brown also observed Mr. Short write "die, Brenda G," and "Brenda G is a slut," and "burn Brenda G" next to the pictures.  Rec. vol. IV, at 171-72.  The OCCA noted that "the fact that [Mr. Short] wrote the derogatory comments next to the pictures makes it more probable that [Mr. Short] drew the pictures."  980 P.2d at 1095.  Mr. Brown's testimony regarding the inscriptions supported the State's contention that Mr. Short intended to start the fire.

In addition, Mr. Brown testified to conversations he had with Mr. Short regarding the means of committing the crime and Mr. Short's motive.  According to Mr. Brown, Mr. Short confided that, after discovering Brenda having sexual intercourse with Mr. Hines, he filled a Coke bottle with gasoline and threw it into the apartment.  Mr. Brown also testified that Mr. Short's nickname in the cell was "Fireball" and that Mr. Short had asked him if he knew whether fingerprints could be pulled off a bottle if he had tape on his fingers.

The prosecution twice referred to Mr. Short's confession to Mr. Brown during its first-stage closing.  Rec. vol. V, at 95, 99.  Despite the State's current and contrary characterization of Mr. Brown's testimony as "peripheral," Aple's Br. at 51, Mr. Brown's testimony was indeed relevant to the prosecution because it served as the only testimony from an unrelated party directly connecting Mr. Short to the crime.  Further, as the record reflects, District Attorney Robert Macy

21

has testified that he does not "like to use [jailhouse informants] unless they can fulfill a critical element that you can't fill in any other way. . . . I just think if you can make your case without using an informant, you're better off." Depo. of Robert Macy, May 13, 1999, at 81 App. Ex. J. (Case. No. CIV-96-882, *Romano v. Ward*).

Mr. Bayless's proffered testimony, if true and credible, was similarly relevant. It would have served to impeach Mr. Brown's testimony regarding who wrote the derogatory comments and threats about Brenda Gardner on the cell walls in addition to creating doubts as to who drew the pictures. We thus proceed to the second part of the compulsory process inquiry, balancing "the state's interest in excluding the evidence" with "[Mr. Short's] interest in its admittance." *Richmond*, 122 F.3d at 872.

(ii) <u>Balancing the interests of the State and Mr. Short</u>

It is undisputed that the State received no notice of Mr. Bayless's status as a witness until the first day of trial. We agree that, had Mr. Bayless been allowed to testify at trial, defense counsel's failure to abide by Oklahoma's discovery code would have prejudiced the State to some extent: the prosecutor would have had only a very limited time to investigate and prepare for cross-examination. Moreover, Mr. Short has failed to explain the delay in notifying the State. Mr. Brown–the witness whose testimony Mr. Bayless would have impeached–testified at the preliminary hearing, which took place nearly eighteen months before the

22

trial began.

Nevertheless, the exclusion of relevant, probative, and otherwise admissible evidence is an extreme sanction that should be used only when justified by "some overriding policy consideration." *United States v. Davis*, 639 F.2d 239, 243 (5th Cir. 1981); *see also* 2 ABA STANDARDS FOR CRIMINAL JUSTICE § 11-4.7(a) (2d ed. 1980) ("The exclusion sanction is not recommended because its results are capricious."). At trial, defense counsel contended that the appropriate remedy would be to grant the State the needed time to talk to Mr. Bayless, or to grant a recess. The trial court did not address these options, but rejected them implicitly:

> we have our discovery rules which . . . should have some meaning. It's to prevent both sides from trial by ambush. . . . Sometimes there are exceptions where – for reasons that could not be avoided, some witness could not be secured in time to provide the other side that witness's name. I don't believe that's the case here.

Rec. vol. IV, at 199.

However, "prejudice . . . could [have been] minimized by granting a continuance." *Taylor*, 484 U.S. at 413; *see United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002) ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."); *United States v. Gonzales*, 164 F.3d 1285, 1293 (10th Cir. 1999) (suggesting lesser sanctions for the violation of a discovery order, such as censuring the government attorney); *Rojem*, 130 P.3d at 297 ("Where the discovery violation is

23

not willful, blatant or calculated gamesmanship, alternative sanctions are adequate and appropriate."). The state had already presented its case-in-chief, as Mr. Brown was its final witness, so a recess would not have created an unnatural break in its presentation of evidence, although a recess would have likely required holding the jury over during the delay. (Indeed, we note that the trial court did grant a continuance on the following day, Friday April 11, 1997, until Tuesday April 15, 1997, because defense expert Ms. Eddings was unavailable.)

In addition, the State's interest in the exclusion of Mr. Bayless's testimony is mitigated by the absence of evidence that Mr. Short or his counsel acted in bad faith. While we do not hold that bad faith is an absolute condition to exclusion, "we agree with those circuits that have treated bad faith as an important factor but not a prerequisite to exclusion." *United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992) (citing *Eckert v. Tansy*, 936 F.2d 444, 446 (9th Cir. 1991) and *Chappee v. Vose*, 843 F.2d 25, 29-32 (1st Cir. 1988)); *see Taylor*, 484 U.S. at 417, n.23 (noting Illinois state courts' use of the preclusion sanction in the exceptional case "where the uncooperative party demonstrates a deliberate contumacious or unwarranted disregard of the court's authority") (internal quotation marks omitted). Here, there was no finding of counsel's bad faith, and no evidence of Mr. Short's complicity in the discovery violation. *See Taylor*, 484 U.S. at 417 ("Whenever a lawyer makes use of the sword provided by the Compulsory Process Clause, there is some risk that he may wound his own

24

client.") (footnote omitted); *id.* at 433 (Brennan, J., dissenting) (noting that "[t]he threat of disciplinary proceedings, fines, or imprisonment will likely influence attorney behavior to a far greater extent than the rather indirect penalty threatened by evidentiary exclusion").

As to Mr. Short's interest in offering testimony from Mr. Bayless, the fact that he was facing the death penalty is very significant. *See Morgan v. Dist. Court of Woodward County*, 831 P.2d 1001, 1005 (Okla. Crim. App. 1992) (stating "it would be inappropriate to exclude defense witnesses from testifying in a death penalty case . . . when the actions of defense counsel, and not the defendant[], have prevented compliance with the Trial Court's order"); *Rojem*, 130 P.3d at 297 (same); *Allen v. State*, 944 P.2d 934, 937 (Okla. Crim. App. 1997) (exclusion "too severe a sanction"); *Wisdom v. State*, 918 P.2d 384, 396 (Okla. Crim. App. 1996) (concluding that the improper exclusion of a defense witness warranted re-sentencing); *see also Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *Burger v. Kemp*, 483 U.S. 776, 785 (1987) ("'Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'"). Moreover, unlike other cases in which we have upheld the exclusion of evidence, we cannot say that Mr. Bayless's testimony would have been "only marginally relevant." *Richmond*, 122

25

F.3d at 874; *see also Wooten*, 377 F.3d at 1241 (observing that an exhibit that was admitted into evidence "accomplished as much (and perhaps more) for [the defendant] than if he had been permitted to call [the excluded witness] to the stand").

In light of these competing considerations, we conclude that the interests of the State and Mr. Short are at least in equipoise. We therefore proceed to examine the OCCA's conclusion that Mr. Bayless's testimony was not material.

(iii) <u>Materiality</u>

Under the standard promulgated by the Supreme Court, evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982); *see also Richmond*, 122 F.3d at 872 ("Evidence is material if its suppression might have affected the trial's outcome."). A "reasonable likelihood" or "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994).

Here, Mr. Short proffered Mr. Bayless as an impeachment witness—one who could rebut Mr. Brown's testimony that Mr. Short wrote the derogatory comments and threats about Brenda Gardner on the walls of the holding cell.

26

Courts have found impeachment evidence material "if the witness whose testimony is attacked supplied the only evidence linking the defendant[] to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (10th Cir. 1996) (internal quotation marks and citations omitted). However, when potential impeachment evidence merely constitutes "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," courts have concluded that the evidence is not material. *Id.*

Here, as the OCCA reasoned, Mr. Brown's testimony about Mr. Short's statements and conduct in the holding cell was by no means the only evidence linking him to the firebombing of Brenda Gardner's apartment and the murder of Mr. Yamamoto. Marjorie Long, Brenda Gardner, Janet Gardner, and Keith Partain testified that Mr. Short made threatening remarks toward Brenda and her family in the weeks before the murder. Brenda Gardner testified that she saw Mr. Short standing outside her apartment at 4:00 a.m. on the day of the murder. Additionally, the prosecution introduced evidence that Mr. Short's coat and sneakers had testified positive for gasoline and that a homicide detective had discovered lighter fluid in Mr. Short's motel room.

Moreover, even though Mr. Short was not able to offer testimony from Mr. Bayless to impeach Mr. Brown, he was able to challenge Mr. Brown's credibility in other ways. In particular, Mr. Short's attorney elicited through cross-

27

examination that Mr. Brown was addicted to cocaine and had been arrested for possession of marijuana with intent to distribute. Mr. Brown admitted that he believed he faced a potential sentence of five to twenty-five years' imprisonment and that he negotiated a deal with the government for a deferred sentence in exchange for his testimony against Mr. Short. In closing argument, Mr. Short's attorney maintained that Mr. Brown was not credible and had "marketed information to preserve [himself]." Rec. vol. V, at 110. Finally, he noted that Mr. Brown's description of Mr. Short's statement about the bombing was inconsistent with the other evidence offered by the State. According to Mr. Brown, Mr. Short said that he had opened the patio door and thrown the firebomb inside the apartment; other evidence indicated that the firebomb had crashed through the patio door.

Thus, evidence apart from Mr. Brown's testimony implicated Mr. Short in the murder. *See Young v. Workman*, 383 F.3d 1233, 1238 (10th Cir. 2004) (affirming the denial of a petition for a writ of habeas corpus noting "[g]iven the other evidence introduced at trial, we are not persuaded the [excluded] evidence . . . would be anything more than cumulative"). Moreover, Mr. Short was able to challenge Mr. Brown's credibility by means other than the proffered testimony of Mr. Bayless. Accordingly, we cannot say that the OCCA unreasonably applied federal law by concluding that Mr. Bayless's testimony was not material: to find, as the OCCA implicitly did, that there was not "a reasonable likelihood that [Mr.

28

Bayless's] testimony could have affected the judgment of the trier of fact," *Valenzuela-Bernal*, 458 U.S. at 874, may have been a debatable proposition, *see Watley*, 218 F.3d at 1159 (noting that "reasonable minds could disagree" about the exclusion of an alibi witness); however, it was not an unreasonable one.

### d. Conclusion

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Here, the exclusion of Mr. Bayless's testimony deprived the jury of relevant evidence. Nevertheless, given our deferential review under AEDPA, we cannot say that it was contrary to, or an unreasonable application of, established federal law.

### 2. Exclusion of Mr. Bayless's testimony at the sentencing stage

Mr. Short contends that the exclusion of Mr. Bayless's testimony also substantially affected the outcome of the sentencing stage. At sentencing, the prosecutor told the jury that "in jail [Mr. Short] bragged about how he'd thrown a fire bomb on Robert." Rec. vol. VI, at 141. Mr. Short maintains that his inability to confront and controvert this evidence prejudiced him. However, the OCCA concluded that Mr. Bayless's testimony as proffered would not directly contradict Mr. Brown's testimony regarding the confession. As we held above, the OCCA's determination that Mr. Short did not show that he was substantially prejudiced by the exclusion of Mr. Bayless's testimony was not an unreasonable application of

29

clearly established federal law. Thus, the OCCA's rejection of this challenge to the sentencing proceedings also was not unreasonable.

**B. Admission of victim impact evidence during the sentencing stage**

Mr. Short contends that the admission of certain victim impact evidence violated his constitutional right to a fundamentally fair sentencing hearing. He challenges the prepared statement of Kiyoka Yamamoto, Mr. Yamamoto's mother, asserting it contained certain statements that exceeded the bounds of admissible evidence.

The State filed the victim impact statement in October 1996, six months prior to trial. Defense counsel had ample time to review and object to the statement before trial. Rather than objecting, defense counsel "agreed that it substantially complied with the law." *Short*, 980 P.2d at 1100. Defense counsel moved for a mistrial only at the end of the presentation of the testimony.

Here, the OCCA decided:

The victim impact evidence in this case *comes very close to weighting the scales too far on the side of the prosecution* by so intensely focusing on the emotional impact of the victim's loss. . . .

Mrs. Yamamoto's statements concerning her feelings and actions upon learning of her son's injury and subsequent death were emotional, but fell within the guidelines set forth in *Cargle* and § 984. These statements were probative of the emotional, psychological, and physical effects she experienced as a result of the death of her only child. Mrs. Yamamoto's statements concerning her son's desire to study in America, his eventual achievement of that goal and his concern for his mother provided a brief glimpse of the unique characteristics of the individual known as Ken Yamamoto. *While her statements concerning*

*her fifteen year illness, her son's wish to be buried in Oklahoma City, and her son's death bed thoughts upon seeing his mother were not relevant victim impact evidence, their admission did not prevent the jury from fulfilling its function in the second stage of trial.* While a portion of the victim impact testimony was very emotional, taken as a whole, the testimony is within the bounds of admissible evidence, and *its focus on emotion did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty.*

*Id.* at 1101 (emphasis added).

In *Payne v. Tennessee*, the Supreme Court clarified the scope of admissible victim impact evidence during sentencing. 501 U.S. 808, 825 (1991). As we have noted, in *Payne* the Court held

> that the Eighth Amendment erects no per se bar to victim impact evidence. The Court acknowledged that "[a] State may legitimately conclude," as Oklahoma has, "that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." In most cases, such evidence "serves entirely legitimate purposes." But in some cases, victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the due process clause of the Fourteenth Amendment.

*Turrentine v. Mullin*, 390 F.3d 1181, 1200 (10th Cir. 2004) (internal citations omitted).

Section 984(a) of Title 22 of the Oklahoma Statutes restricts victim impact evidence to "financial, emotional, psychological, and physical effects" of the impact of the crime itself on the victim's family and some personal characteristics about the victim. *Id.* Here,

the trial court noted it had read Mrs. Yamamoto's statement and found

31

> it to be in conformity with [Oklahoma law]. The court was informed that Mrs. Yamamoto, a Japanese citizen, would read her statement in Japanese then it would be translated into English by an interpreter. Defense counsel agreed to the procedure and noted that the defense had had a copy of Mrs. Yamamoto's statement for awhile and agreed that it substantially complied with the law.

*Short*, 980 P.2d at 1100. Mr. Short contends that the victim impact testimony exceeded the statute's bounds and was unduly prejudicial. Our review, however, is limited to federal law.

Mrs. Yamamoto conveyed the following: Mr. Yamamoto was her only son, she raised him herself, he was twenty-two years old at the time of his death, he came to America to study art, he was an excellent student at Oklahoma City University, he called her every two or three days and visited in the summer, he had cared for her during a fifteen-year illness, and he wanted to stay in America and study but he was worried about her. She stated that she received a telephone call at her home in Kyoto, Japan, about her son's injuries and the hospital's belief that he had only fifteen hours to live. Under a great amount of stress, she flew to Oklahoma City to see her son for the last time. She believed that he waited for her to come, recognized her voice, tried to move his head, and then passed away. Also, she presented her interpretation of what he must have been thinking when she arrived at the hospital. In addition, she stated that seeing fires, bombs, and emergencies on television was very stressful for her, and that she buried her son in Oklahoma at his request. Finally, she said that her son's death had greatly

32

affected her life.

At the close of this testimony, as noted, defense counsel objected to the victim impact evidence and requested a mistrial, arguing that counsel did not recognize until this point "how emotional the evidence would be." *Id.* at 1101.

> The trial court admitted the evidence was emotional, noting that the witness cried and that she was permitted a few minutes to regain her composure. The court noted however that the witness got through her testimony, and that it was still of the opinion the evidence was proper under *Cargle* [*v. State*, 909 P.2d 806, 824-25 (Okla. Crim. App. 1995)]. The request for a mistrial was overruled.

*Id.*

The OCCA's inquiry focused on its decision in *Cargle*, 909 P.2d at 824-25, which applied the Supreme Court's decision in *Payne.* In *Cargle*, the OCCA reviewed victim impact evidence of a victim's sisters, and testimony from another victim's mother and determined that it "exceeded the statutory framework of admissible evidence." *Id.* at 829. For example, one statement portrayed one victim as a "cute child at age four," which "in no way provides insights into the contemporaneous and prospective circumstances surrounding his death" nor concerns the impact of the crime upon the victim's immediate family. *Id.* The OCCA concluded that "the entire statement . . . goes to the emotional impact of [the victim's] death. There is no explicit testimony as to the financial, psychological or physical effects of the crime on his family." *Id.* at 829-30. However, after acknowledging these errors, the OCCA concluded they were

33

"harmless beyond a reasonable doubt." *Id.* at 835. Although it granted relief on other grounds, the Tenth Circuit held that the OCCA's decision in denying relief on this ground was not an unreasonable application of federal law. *Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003).

Here, as in *Cargle*, we must assess the alleged prejudicial effect of the victim-impact testimony by examining the aggravating and mitigating factors and the overall strength of the State's case. In doing so, we note that Mr. Short's assertions of prejudice are undermined by his counsel's delay in challenging Mrs. Yamamoto's statement. Counsel had the English version of the victim impact statement six months before trial began. Nevertheless, he did not challenge its admission until after the entire statement was read to the jury. The absence of a contemporaneous objection deprived the trial court of the ability to curtail any troubling portions of the statement. Counsel's argument that he could not foresee the extreme emotional impact of the victim impact statement is particularly unconvincing when there is but one impact statement to be read by a family member. Mindful of that unjustified delay, we proceed to examine the evidence presented at sentencing.

In addition to the emotional statement given by Mrs. Yamamoto, the prosecution presented the following testimony in support of the statutory aggravators:

(1) Susan Short, Mr. Short's wife of seven years, who had filed for

34

divorce, testified that Mr. Short physically and emotionally abused her and her children. Ms. Short stated that she had obtained a protective order in 1991 against Mr. Short. She also testified that she had asked him during the summer of 1986 if he knew how to make a firebomb and that he explained to her how to make one.

(2) Troi Lyn Billy, testified that in July 1991 she had offered her home to the Short family. Ms. Billy and her husband asked Mr. Short to leave after a week. According to Ms. Billy, Mr. Short threatened to sexually assault her and to kill her and her children. Ms. Billy filed two police reports and obtained a protective order against Mr. Short.

(3) Debra Duncan, who had lived with and had a child with Mr. Short, testified that she sought two protective orders against Mr. Short, and then had each dismissed.

In closing, the prosecution reminded the jury that Mr. Short had knowingly endangered more than one person in the apartment complex. Next, the prosecution defined the "heinous, atrocious, or cruel" aggravator, and argued that Mr. Yamamoto unquestionably suffered serious physical injury. The prosecutor also argued that Mr. Short undoubtedly posed a continuing threat to society based on his past actions, and his horrific upbringing that instilled this learned behavior. During final rebuttal, the prosecution referred to the victim impact

35

testimony and Mrs. Yamamoto's suffering several times.

The defense presented the following witnesses in its effort to present mitigating circumstances, which the jury may have considered as extenuating or reducing the degree of moral culpability or blame.

(1) Trina Louise Hartshorn, Mr. Short's sister, testified about their upbringing. According to her testimony, their mother was often in prison, was a "rage-a-holic" and frequently used intravenous drugs in front of the children. She stated that her stepfather sexually abused her and physically abused her mother and Mr. Short. She suspected that her father and her stepfather sexually abused Mr. Short.

(2) Nelda Rawson, Mr. Short's first cousin, also testified to Mr. Short's violent childhood surroundings. She stated that his father physically abused his mother and threatened her with a knife. She asked the jury to spare Mr. Short's life.

(3) Sharon Kay Davis, Mr. Short's first cousin, testified that she witnessed Mr. Short's father abuse his mother. Ms. Davis testified regarding Mr. Short's mother's drug use, and how she took care of Mr. Short and his sister for two years when they were children. She also asked the jury to spare Mr. Short's life.

(4) and (5) Thomas Ackerman, Jr. and Anthony Mark Benjamin, both correctional officers at the Oklahoma County jail, each testified

36

that they were frequently on duty watching Mr. Short. Both testified that Mr. Short was cooperative, obeyed orders, and had not been a problem in the jail.

(6) S. Daryl Larson, a volunteer jail chaplain at the Oklahoma County jail, testified that he met weekly with Mr. Short, and that Mr. Short had a genuine interest in religion and Jesus Christ.

(7) Dr. Wanda Draper, a clinical professor in the psychiatric department at the University of Oklahoma's College of Medicine, reviewed Mr. Short's records, and interviewed Ms. Hartshorn and Ms. Rawson. Dr. Draper testified about the impact of Mr. Short's unstable and traumatic family dynamics. She stated that his mother was a prostitute and often brought men into the home when Mr. Short was a preschooler. She stated that his mother did not take him to school. His father gave him wine when he was two years old, and potty trained him by rubbing his feces in his face. According to Dr. Draper, Mr. Short was abandoned by nearly every adult in his life, most significantly by his mother who was arrested twenty-two times during his childhood. She noted that on the few occasions that he was surrounded by people who set boundaries, he was able to work and save money. Dr. Draper testified that the Oklahoma County jail was a structured environment and his time there served as a good

predictor of how he might do in prison. She also testified he would not be a danger to others in prison.

Defense counsel beseeched the jury for mercy, and emphasized Mr. Short's horrific childhood, and the relentless physical, emotional, and sexual abuse he endured. Defense counsel suggested that his upbringing introduced him to criminal behavior and familiarity with drug use. Noting that Mr. Short was not to be excused for his behavior, counsel implored the jury to consider life imprisonment as an alternative to the death penalty.

Based on our deferential standard of review–despite the presence of considerable and compelling mitigation evidence–there is no indication that the jury was prevented from fully considering these mitigating factors. Moreover, examining the relative strength of the State's case under *Cargle*, there was little if any testimony presented during the sentencing phase that supported a residual doubt theory or that impacted the strength of the State's evidence as to Mr. Short's involvement in setting the blaze. Furthermore, the jury found three aggravating circumstances and insufficient mitigating circumstances to outweigh them when it imposed the death penalty.

We agree that Mrs. Yamamoto's statement contained irrelevant information, and that much of the statement was highly emotional. However, like the OCCA, we conclude that the admission of irrelevant and overly emotive testimony, though troubling and "com[ing] very close to weighting the scales too

38

far on the side of the prosecution," did not tip the scales far enough. *Short*, 980

P.2d at 1101. Thus, the OCCA did not unreasonably apply clearly established

federal law as to its assessment.

**C. Prosecutorial misconduct during the sentencing phase**

In his third proposition, Mr. Short contends that the State committed

repeated instances of prosecutorial misconduct during the sentencing stage

through its excessive misuse of victim impact evidence, and that this conduct

resulted in a fundamentally unfair proceeding.

Improper prosecutorial argument will only warrant federal habeas relief if

it renders a petitioner's trial or sentencing fundamentally unfair. *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 642 (1974). To establish that a prosecutor's

remarks were so inflammatory that they prejudiced substantial rights, a petitioner

must overcome a high threshold: he or she must demonstrate either persistent and

pronounced misconduct or that the evidence was so insubstantial that absent the

remarks, the jury would not have imposed the death penalty. *Berger v. United*

*States*, 295 U.S. 78, 89 (1935).

Mr. Short's counsel objected to none of the challenged statements.

Reviewing for plain error and stressing the other evidence supporting the

aggravators, the OCCA noted that because "*the majority of the victim impact*

*evidence was properly admitted . . .* [w]e find nothing in the record to support

[Mr. Short]'s claims of bad faith and disrespect for this Court on the part of the

prosecutors.  This allegation is denied." *Short*, 980 P.2d at 1104-05 (emphasis added).

The OCCA did recognize that certain of the prosecutor's comments "ha[ve] been repeatedly condemned by this Court. . . .  However, under the evidence in this case, we cannot find the comments affected the sentence." *Id.* at 1104-05. Furthermore, the OCCA determined that their cumulative effect did not "deprive the defendant of a fair trial." *Id.* at 1105 (quoting *Duckett v. State*, 919 P.2d 7, 19 (Okla. Crim. App. 1995).  Considering, as the OCCA did, the evidence in support of the three aggravating factors, the above-described evidence in support of mitigation, and the strength of the State's case as to Mr. Short's guilt, we agree with the district court that the OCCA's decision was not an unreasonable application of federal law.

**D. Ineffective assistance of counsel during the sentencing phase**

Mr. Short's fourth issue for review asserts a deprivation of effective assistance of counsel at sentencing, in particular, for counsel's failure to object to the victim impact statement offered by Mrs. Yamamoto.  Mr. Short also contends that the OCCA unreasonably applied federal law because it erroneously applied *Lockhart v. Fretwell*, 506 U.S. 364 (1993), rather than the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Reviewing de novo, we reject Mr. Short's ineffective assistance of counsel contention.

40

**1. Standard of review**

We begin with a consideration of the appropriate standard of review for ineffective assistance of counsel. Here, the OCCA first set forth the *Strickland* two-step deficient performance and prejudice test, and then discussed the fundamental fairness requirement set forth in *Lockhart. Short*, 980 P.2d at 1106. We have held that "[a]pplication of this more onerous [*Lockhart*] standard [is] contrary to the Supreme Court's clearly established precedent in *Strickland*." *Spears v. Mullin*, 343 F.3d 1215, 1248 (10th Cir. 2003).

Here, the OCCA relied in part on the standard set forth in *Lockhart*, 506 U.S. at 369-70 (1993). In considering the prejudice prong, the OCCA noted that "[a]lthough we must consider the totality of the evidence which was before the factfinder, our 'ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.'" *Short*, 980 P.2d at 1106 (quoting *Strickland*, 466 U.S. at 695). When applying its standard of review, the court noted that "[a]s our ultimate focus must be in the fundamental fairness of the trial, we find that [Mr. Short] has failed to rebut the strong presumption that counsel's conduct was professionally reasonable and that he has failed to show that he was denied a fundamentally fair trial." *Id.* at 1107.

As the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 392-93 (2000), the *Lockhart* "fundamentally unfair" inquiry is used to supplement the ordinary prejudice inquiry under *Strickland* only when the law

41

has changed after counsel's allegedly deficient performance. *Malicoat v. Mullin*, 426 F.3d 1241, 1260 (10th Cir. 2005). The *Lockhart* inquiry has "no effect on the prejudice inquiry in the vast majority of cases." 529 U.S. at 393 n.18 (quoting *Lockhart*, 506 U.S. at 373 (O'Connor, J., concurring)); *see Glover v. United States*, 531 U.S. 198, 203 (2001) ("The Court explained last Term that our holding in [*Lockhart*] did not supplant the *Strickland* analysis.").

"Because the OCCA applied the incorrect standard, we do not defer to its analysis of this claim." *Malicoat*, 426 F.3d at 1260; *see Spears*, 343 F.3d at 1248 (10th Cir. 2003) (concluding that, because the OCCA had "applied *Strickland*, but as further restricted by *Lockhart*," the OCCA's ruling was not entitled to deference under AEDPA). We thus we examine the claim de novo, applying the two-part *Strickland* standard which requires (1) a showing that counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that, but for the errors, the result of the proceeding would have been different. 466 U.S. at 688-94.

### 2. Analysis of ineffective assistance at sentencing claim

Mr. Short contends that he was deprived of effective assistance of counsel at the sentencing stage because counsel did not object to the victim impact statement. In a brief paragraph disposing of this claim, after noting the victim impact statement was "properly admitted," the OCCA concluded that counsel was not ineffective for failing to object to it. *Short*, 980 P.2d at 1107. The federal

district court agreed that "[b]ecause the testimony of Mrs. Yamamoto was properly admitted, counsel cannot be considered to have rendered ineffective assistance for failing to object to its admission." Rec. vol. I, doc. 53, at 20.

We read the OCCA's opinion to have held that certain limited parts of Mrs. Yamamoto's statements (i.e., "Mrs. Yamamoto's statements concerning her fifteen year illness, her son's wish to be buried in Oklahoma City, and her son's death bed thoughts upon seeing his mother") "were not relevant victim impact evidence," and as such, the evidence could not be "properly admitted." *Short*, 980 P.2d at 1101, 1107. In fact, the OCCA noted that the evidence came "very close to weighting the scales too far on the side of the prosecution." *Id.* at 1101. However, the OCCA concluded that the victim impact statement's "focus on emotion did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a moral reasoned decision on whether to impose the death penalty." *Id.*

Counsel had received a copy of the statement six months before trial and agreed that it substantially complied with the law. Counsel later argued that he did not anticipate "how emotional the evidence would be prior to it being presented at trial." *Id.* We note that counsel did object and ask for a mistrial after the victim impact testimony was read into the record, and the trial court denied this request.

Even if we assume that trial counsel's performance was deficient for his

failure to object earlier, Mr. Short cannot establish prejudice. We are unable to conclude that a reasonable probability exists that, had counsel timely and successfully objected to this testimony and commentary, the jury would have imposed a sentence other than the death penalty. The irrelevant portions of Mrs. Yamamoto's statement were only a small part of a statement that was, for the most part, admissible under *Payne*.

Under our de novo review, and considering the significant and emotional mitigating evidence Mr. Short presented, we conclude that Mr. Short has not satisfied the prejudice prong of *Strickland*, and thus he is not entitled to habeas relief.

## E. Cumulative error at the sentencing stage

Finally, Mr. Short maintains that the aggregate impact of the guilt and sentencing stage errors warrants reversal of his convictions or at least a remand for resentencing. The OCCA rejected this claim because it determined that any errors were harmless, even in the aggregate. *Short*, 980 P.2d at 1109 ("While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied [Mr. Short] a fair trial."). Mr. Short asserts that the error in excluding testimony from Mr. Bayless prejudiced him both at the guilt and sentencing stages. He also argues that the errors arising from the admission of certain victim impact evidence, prosecutorial misconduct, and ineffective assistance of counsel at sentencing establish a reasonable

44

probability that, absent these errors, the result of the proceedings would have been different.

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (internal quotation marks omitted). We have found no additional constitutional errors, and thus we only review the OCCA's decision under our deferential AEDPA standard. *See Cargle*, 317 F.3d at 1206. Given this level of deference, we cannot determine that the OCCA's evaluation of the cumulative impact of the trial court errors was contrary to or an unreasonable application of clearly established federal law.

## IV. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court denying Mr. Short's 28 U.S.C. § 2254 petition.